[No. B076597. Second Dist., Div. Three. May 22, 1996.]

ROBERT SCOFIELD, as Administrator, etc., et al., Plaintiffs and Respondents, v.
CRITICAL AIR MEDICINE, INC., et al., Defendants and Appellants.

992

## COUNSEL

Bonne, Bridges, Mueller, O'Keefe & Nichols, Kenneth N. Mueller and Mark B. Connely for Defendants and Appellants.

David M. Harney, Thomas Kallay and Robert H. Pourvali for Plaintiffs and Respondents.

## OPINION

**KLEIN, P. J.**—Defendants and appellants, Critical Air Medicine, Inc., Executive Air Services, Inc., Harry A. Metz, and Kenneth Malcomson (collectively Critical Air), appeal the judgment entered following a jury verdict in favor of plaintiffs and respondents Erin Scofield (Erin) and Laura Scofield (Laura), by and through their guardian ad litem, Robert Scofield (collectively, the Scofields). The jury awarded Erin and Laura $60,000 each in damages for their claims of false imprisonment.[1]

In this fact situation involving the tort of false imprisonment, we are called upon to clarify some issues in a troublesome area of the law. We

---

[1] In the same action, Erin and Laura, and Robert Scofield, administrator of the estate of David Scofield (David), deceased, named as defendants various Kaiser entities and others, and pleaded causes of action for negligence, fraud, intentional infliction of emotional distress,

conclude false imprisonment involves an unlawful restraint or confinement which may be effected in a variety of ways, not only by force or threat of force, but also by fraud or deceit, or any other form of unreasonable duress. The tort requires knowledge of the restraint or confinement at some time, whether contemporaneous or subsequent, and resulting harm or damage.

Because the judgment is supported by substantial evidence and the controlling instruction, although general and somewhat incomplete, was correct in law, the judgment is affirmed.

### FACTUAL AND PROCEDURAL BACKGROUND[2]

1. *Plaintiffs' case.*

On December 29, 1990, Nancy Scofield, the mother of Erin, Laura, and David, was killed in a truck accident in Baja California, Mexico. Thirteen-year-old David was seriously injured, and eleven-year-old Erin and eight-year-old Laura suffered minor injuries. Jackie and William Dalton witnessed the accident and drove the children to the nearest medical facility in Guerrero Negro, Mexico. Robert Scofield (Scofield), Nancy's husband and the father of the children, was contacted in the Los Angeles area.

Scofield telephoned the Daltons at the clinic in Guerrero Negro, and was informed his son had suffered a head injury and was in a coma. Scofield then called several air transport services. Each of the air charter companies informed Scofield the Guerrero Negro airstrip had no lights and it would be impossible to fly the children out until the next morning. Believing his son might not live through the night, Scofield contacted the American Consulate and spoke with Kathleen List (List).

List contacted Cindy Clemment (Clemment) at the Bi-National Health Committee. Clemment called Hartsen's Ambulance Service. When Clemment was informed Guerrero Negro was approximately 600 miles south of San Diego, she determined an air transport would be necessary. Clemment told the representative of Hartsen's, who suggested Critical Air could make the transport, she " '[was] going to take care of it,' " and " 'if she need[ed] further assistance, [she would] call [Hartsen's] back.' "

---

conspiracy, medical negligence, and wrongful death. As to the Kaiser defendants, the case was severed and the matter was submitted to binding arbitration.

[2]We view the facts adduced at trial in the light most favorable to the judgment (*Gyerman* v. *United States Lines Co.* (1972) 7 Cal.3d 488, 492, fn. 1 [102 Cal.Rptr. 795, 498 P.2d 1043]), and begin with a plenary summary of the facts and proceedings below as necessary to address the issues presented on appeal. (See *Bily* v. *Arthur Young & Co.* (1992) 3 Cal.4th 370, 376 [11 Cal.Rptr.2d 51, 834 P.2d 745].)

The Bi-National Health Committee utilized the services of several air transport companies, including Schaeffer's, Air Evac and Critical Air. The usual practice was to rotate the companies as services were needed. Since Air Evac was next on the list, Clemment called that company. Clemment then telephoned Scofield and informed him that at 8:15 that evening, an "Air Evac 421 flight team" would be ready to depart from Montgomery Field in San Diego to retrieve his children. Clemment instructed him to be in San Diego at 1 o'clock the next morning when the children were scheduled to arrive.

As soon as she had finished making the arrangements, Clemment received a call from a Critical Air employee, Carlos Ayala. When Clemment told Ayala she already had arranged for Air Evac to transport the children, Ayala stated, " 'Don't bother, we're going to go pick them up. We already have the information.' " Clemment informed Ayala she was " 'taking care of [the situation].' " Clemment then contacted a Red Cross worker named Francisco Amador in Guerrero Negro. She told Amador "the [Scofield] children were not to be discharged to anybody other than this specific [Air Evac] crew."

Air Evac pilot, Richard Jones, got a crew ready to fly to Guerrero Negro. Jones obtained a United States customs number, and was informed Critical Air was also planning a flight to Guerrero Negro. Jones telephoned the Air Evac flight coordinator for clarification. The flight coordinator told Jones to continue with his flight plan and at approximately 8 p.m. on December 29, 1990, Jones and his crew left Montgomery Field, flying toward Tijuana, Mexico. Immediately after the Air Evac plane completed its take-off, Critical Air's plane took off from a different runway at Montgomery Field.

The Critical Air pilot, Stuart Bachman, knew an Air Evac plane was also flying to Guerrero Negro. As the two planes approached the Tijuana airport, Bachman maneuvered his plane in front of and below Air Evac's plane, forcing the Air Evac plane to turn to avoid a collision. As a result, the Critical Air plane landed first, proceeded through customs, and left ahead of the Air Evac plane.

Critical Air's plane, which bore no distinctive markings or logo, arrived in Guerrero Negro about 20 minutes before the Air Evac flight. Bachman did not tell anyone on the ground the plane was from Critical Air, not Air Evac. The Daltons watched as the Critical Air crew, whose clothing had no distinctive markings, quickly loaded the three Scofield children onto the plane. Before the Air Evac plane landed in Guerrero Negro, Bachman had taken off.

Scofield had spoken with Erin on the telephone and told her he was sending a plane to take her, Laura and David back to the United States. Had anyone told Erin the plane was not the one her father had sent for her, she would not have boarded.

Clemment met Scofield in San Diego. Clemment told him although she had dispatched the Air Evac plane to retrieve his children, Critical Air had interfered and also had sent a plane to Mexico. Clemment informed Scofield she was not sure which service would transport the children, and at which airstrip they would be landing. Scofield was extremely upset; he had authorized Air Evac to transport his children, not Critical Air.

At approximately 1 a.m., Critical Air's plane landed at Montgomery Field. The children were taken off the plane, loaded into an ambulance and taken to Sharp Hospital. David was later transferred to Children's Hospital.[3]

2. *The defense.*

The president of Critical Air, Harry Metz (Metz), first learned of the Scofields' accident in Mexico when a Hartsen's Ambulance Service employee telephoned a Critical Air employee. When Metz contacted the United States Consulate about the situation, he was informed arrangements to transport the children already had been made. Metz indicated later he was led to believe he could continue to pursue the matter.[4]

Although Metz understood Air Evac was sending a plane to Mexico, he made arrangements for the Critical Air plane to fly to Guerrero Negro, and eventually spoke with a Dr. Rodriguez at the clinic there. Metz admitted Critical Air never obtained permission from Scofield or his representative to transport the three children. Metz, however, believed Dr. Rodriguez had authorized Critical Air to fly the children from Guerrero Negro to San Diego.

3. *Proceedings.*

The operative complaint, filed on February 14, 1992, by Scofield as guardian ad litem for the minors, alleged causes of action against Critical Air for negligence; fraud, by misrepresentation or concealment of its lack of

---

[3]Several days later, David was transferred to Kaiser Hospital in Fontana and subsequently died.

[4]A transcript of taped telephone conversations among Metz, several Critical Air employees, and List of the American Consulate, indicated Metz understood Air Evac had been authorized and instructed to retrieve the Scofield children from Guerrero Negro.

authority to transport the children; false imprisonment of the children; intentional infliction of emotional distress; and conspiracy in transporting the children.[5]

The case was tried before a jury. Following 11 days of trial, both sides rested, and the trial court granted Critical Air's motions for nonsuit as to the causes of action for fraud, intentional infliction of emotional distress and conspiracy, and struck the punitive damages allegations. The causes of action for negligence and false imprisonment were submitted to the jury.

The jury was instructed with BAJI No. 7.60, the standard false imprisonment instruction,[6] and a modified version of the same instruction.[7] The trial court refused all the Scofields' requested instructions on fraud and deceit.

As to the cause of action alleging David's wrongful death, the jury found for Critical Air. With regard to Erin's, Laura's and David's claims of false imprisonment, pursuant to a general verdict, the jury awarded Erin and Laura $60,000 each in damages, and David, $68,583.42 in damages, for a total of $188,583.42.[8]

Critical Air moved for judgment notwithstanding the verdict and for a new trial. The trial court granted the motion for new trial as to the $68,583.42 awarded to David's estate, and otherwise denied the motions. The date of the retrial was stayed pending resolution of this appeal.

Critical Air timely appealed.

---

[5]A cause of action for false imprisonment is personal to the victim. (See 3 Levy et al., California Torts (1996) § 42.06, p. 42-17 ["[P]arents cannot recover for the false imprisonment of their children."].) Thus, the cause of action for false imprisonment was properly prosecuted on behalf of the children.

[6]The trial court instructed on BAJI No. 7.60 (1991 rev.), which stated in relevant part: "False imprisonment is the unlawful violation of the personal liberty of another. To constitute a false imprisonment, there must be an intentional and unlawful restraint, confinement or detention which compels the person to stay or go somewhere against his or her will. The restraint necessary to constitute false imprisonment may result either from the exercise of force or from an express or implied threat of force."

[7]The modified instruction, given over Critical Air's objection, omitted reference to force or the threat of force. The modified instruction stated "[f]alse imprisonment is the unlawful violation of the personal liberty of another. To constitute a false imprisonment, there must be an intentional and unlawful restraint, confinement or detention, which compels a person to stay or go somewhere against his or her will."

[8]The jury apparently based its damage award largely on the uncontroverted testimony of Dr. James Long, a psychiatrist. Dr. Long opined the girls' relationship with authority figures had been undermined by Critical Air's deception, and it was reasonably probable the incident would affect their development during adolescence.

## CONTENTIONS

Critical Air contends the trial court erred in giving an instruction on false imprisonment which made no reference to force or the threat of force; the evidence fails to support the jury's finding Critical Air falsely imprisoned the children; and the award of $120,000 in damages to the girls was excessive.[9]

## DISCUSSION

### I. *Essential elements of the tort of false imprisonment disputed.*

Both sides concede the basis for the tort of false imprisonment is the unlawful restraint of another's liberty. But there is considerable disagreement as to other essential elements. The controversy centers on certain key issues: whether force or the threat of force is essential to a cause of action for false imprisonment, or may the tort also be effected by other means, such as fraud or deceit; and whether the tort of false imprisonment requires the victim's contemporaneous awareness of the unlawful detention. The degree of harm necessary to support a cause of action for false imprisonment is also discussed.[10]

#### 1. *False imprisonment may be effected by violence, menace, fraud, deceit or any unreasonable duress.*

Critical Air argues the element of force is an essential element of the cause of action because in the absence of force, it is impossible to establish a defendant's intent to restrain or confine, or the existence of an actual restraint or confinement. However, established statutory and case law reveals force is merely one of a variety of ways by which false imprisonment can be accomplished.

##### a. *Fermino definition.*

■ *Fermino* v. *Fedco, Inc.* (1994) 7 Cal.4th 701, 715 [30 Cal.Rptr.2d 18, 872 P.2d 559], the latest pronouncement by the California Supreme Court on the topic, observes: "The *crime* of false imprisonment is defined by Penal

---

[9]The Scofields have not cross-appealed to challenge the trial court's grant of nonsuit as to certain causes of action or the striking of the punitive damages allegations; they simply argue in support of the judgment.

[10]Pursuant to this court's request at oral argument, counsel for both parties subsequently submitted letter briefs discussing the definition and elements of the tort of false imprisonment.

Code section 236 as the 'unlawful violation of the personal liberty of another.' The *tort* is identically defined. (*Molko* v. *Holy Spirit Assn.* (1988) 46 Cal.3d 1092, 1123 [252 Cal.Rptr. 122, 762 P.2d 46].) As . . . recently formulated [in *Molko*], the tort consists of the ' "nonconsensual, intentional confinement of a person, without lawful privilege, for an appreciable length of time, however short." ' [Citation.] That length of time can be as brief as 15 minutes. (*Alterauge* v. *Los Angeles Turf Club* (1950) 97 Cal.App.2d 735, 736 [218 P.2d 802].) Restraint may be effectuated by means of physical force (*Moffatt* v. *Buffums' Inc.* (1937) 21 Cal.App.2d 371, 374 [69 P.2d 424]), threat of force or of arrest (*Vandiveer* v. *Charters* (1930) 110 Cal.App. 347, 351 [294 P. 440]), confinement by physical barriers (*Schanafelt* v. *Seaboard Finance Co.* (1951) 108 Cal.App.2d 420, 423 [239 P.2d 42]), *or by means of any other form of unreasonable duress.* (See Rest.2d Torts, § 40A.)" (Italics added.)[11]

b. *Methods of accomplishing the tort.*

Because the crime of false imprisonment and the tort are identically defined (*Fermino* v. *Fedco, Inc., supra,* 7 Cal.4th at p. 715; *Molko* v. *Holy Spirit Assn.* (1988) 46 Cal.3d 1092, 1123 [252 Cal.Rptr. 122, 762 P.2d 46]), resort also may be had to the Penal Code to determine the means by which the tort may be brought about.

Penal Code section 236 states: "False imprisonment is the unlawful violation of the personal liberty of another." With respect to the penalty, Penal Code section 237 states: "False imprisonment is punishable by fine not exceeding one thousand dollars ($1,000), or by imprisonment in the county jail not more than one year, or by both. If such false imprisonment be effected by *violence, menace, fraud, or deceit,* it shall be punishable by imprisonment in the state prison." (Italics added.)

The language of Penal Code section 237 was utilized by the Supreme Court in *Molko* v. *Holy Spirit Assn., supra,* 46 Cal.3d at page 1123, which involved a *tort* action for false imprisonment. In *Molko,* one of two plaintiffs, Tracy Leal, contended she was falsely imprisoned by the Unification Church at various locations. (*Ibid.*) Leal admitted, theoretically, she was free to leave at any time, was not physically restrained, and was not subjected to threats of physical force. (*Ibid.*) She urged, however, she had been falsely imprisoned, her imprisonment arising " 'from the harm she came to believe would result if she left the community.' That harm, . . . was that her family

---

[11]*Fermino* dealt with a salesperson allegedly detained by her employer in a windowless interrogation room at work for more than an hour wherein she was accused of stealing.

'would be damned in Hell forever and they would forever feel sorry for having blown their one chance to unite with the Messiah and make it to Heaven.' " (*Ibid.*) Although *Molko* determined Leal's tort claim could not survive constitutional scrutiny because it implicated the church's beliefs, citing Penal Code section 237, it recognized *"false imprisonment may be 'effected by . . . fraud or deceit*[.]' " (*Ibid.,* italics added.)

Accordingly, it is clear that force or the threat of force are not the only means by which the tort of false imprisonment can be achieved. Fraud or deceit or any unreasonable duress are alternative methods of accomplishing the tort. (Pen. Code, §§ 236, 237; *Molko* v. *Holy Spirit Assn., supra,* 46 Cal.3d at p. 1123; *Fermino* v. *Fedco, Inc., supra,* 7 Cal.4th at p. 715.)

c. *Critical Air's reliance on BAJI definition unavailing.*

■ To support its contention that force is an essential element of false imprisonment, Critical Air cites to BAJI No. 7.60 in the current, eighth edition, the sole BAJI instruction dealing with false imprisonment. The instruction requires a false imprisonment claimant to establish that the defendant "intentionally and unlawfully exercised *force or the express or implied threat of force* to restrain, detain or confine the plaintiff." (Italics added.)[12]

Critical Air's reliance on BAJI No. 7.60 is misplaced because said instruction, by its terms, applies to *fact situations where the false imprisonment was accomplished by force or the threat of force.* BAJI No. 7.60 is limited in its scope, and it does not purport to address situations where the false imprisonment was carried out through other means such as fraud, deceit or unreasonable duress. In those cases, as discussed below at part II, section 3(b), in the absence of a pertinent standard BAJI instruction, appropriate instructions must be fashioned to guide the jury as to the applicable law. BAJI No. 7.60, being of limited application, does not support Critical Air's reliance thereon in the fact situation before us.

2. *Contemporaneous awareness of unlawful restraint or confinement is not an essential element.*

In its contention dealing with a *victim's* state of mind, Critical Air also argues an essential element of a civil cause of action for false imprisonment

---

[12]BAJI No. 7.60 currently provides in relevant part: "The essential elements of a claim for false imprisonment . . . are: [¶] 1. The defendant intentionally and unlawfully *exercised force or the express or implied threat of force* to restrain, detain or confine the plaintiff; [¶] 2. The restraint, detention or confinement compelled the plaintiff to stay or go somewhere for some appreciable time, however short; [¶] 3. The plaintiff did not consent to such restraint, detention or confinement. . . . [¶] 4. *The restraint, detention or confinement . . . caused plaintiff to suffer injury, damage, loss or harm.*" (Italics added.)

is that a victim *feel* compelled to stay or go against said victim's will, or that a plaintiff possess a *conscious understanding* of being restrained or confined at the time thereof due to a defendant's exercise of force or threat of force.

The issue apparently is one of first impression in California.[13] After extensive research and careful consideration of the conflicting views in this area, we reject Critical Air's argument that contemporaneous awareness is an essential element of the tort.

### a. *Overview.*

There is scant authority bearing upon this discrete issue. There is the early English case of *Herring* v. *Boyle* (1834 Ex.) 149 Eng.Rep. 1126, which involved a 10-year old boy placed in a school operated by the defendant. When his mother asked the defendant to allow the youth to go home over the Christmas holidays, the defendant refused permission unless the term bill was paid. The boy knew nothing of the request or the refusal. Subsequently, an action for false imprisonment was brought in his name. The Court of Exchequer held there was no liability because the boy was not cognizant of any restraint. (See Prosser, *False Imprisonment: Consciousness of Confinement* (1955) 55 Colum. L.Rev. 847.)

The *original* Restatement of Torts concurred in the position taken by *Herring*, stating ". . . there is no liability for intentionally confining another unless the person physically restrained knows of the confinement." (Rest., Torts, § 42, p. 82.)

In 1955, Prosser, in a well-reasoned law review article, criticized the Restatement position, observing "serious damage might result from [false] imprisonment even though the plaintiff is not aware of the restraint at the time." (Prosser, *False Imprisonment: Consciousness of Confinement, supra,* 55 Colum. L.Rev. at p. 848.) For example, ". . . although the plaintiff might not know he was imprisoned, his captors might be boasting elsewhere that he was." (*Ibid.*) Arguing against the inclusion of consciousness of confinement as an element of the tort, Prosser presciently warned: "[C]ases will arise in which small children, idiots, lunatics, intoxicated people, delirious people, or sick and unconscious people are imprisoned without knowing it, and consequently a tort of real gravity [will have] occurred." (*Id.,* at p. 850.)

---

[13]With respect to the requisite state of mind of a *victim* of false imprisonment, our research into California law has yielded merely a footnote in a dissenting opinion in a criminal case touching on the point. (*People* v. *Rios* (1986) 177 Cal.App.3d 445, 456, fn. 7 [222 Cal.Rptr. 913] (dis. opn. of White, P. J.). See also 3 Levy et al., *supra,* California Torts, section 42.01[1], page 42-6, footnotes 5 and 6, solely citing Prosser and Keeton and the Restatement Second of Torts on this issue.

The Restatement Second of Torts, issued in 1965, retreated from the drastic position taken by the first Restatement. The revision states ". . . there is no liability for intentionally confining another unless the person physically restrained knows of the confinement *or is harmed by it.*" (Rest.2d Torts, § 42, p. 65, italics added.)[14]

However, a comment following Restatement Second of Torts section 42 states "[w]here . . . no harm results from a confinement and the plaintiff is not even subjected to the mental disturbance of being made aware of it at the time, his mere dignitary interest in being free from an interference with his personal liberty which he has only discovered later is not of sufficient importance to justify the recovery of the nominal damages involved. Accordingly, no [cause of] action for false imprisonment can be maintained in such a case." (Rest.2d Torts, § 42, com. a., p. 65.)

Prosser subsequently took issue with the Second Restatement on this point, arguing it was unduly restrictive for disallowing a cause of action where the victim was unaware and solely nominal damage was sustained. (Prosser & Keeton, Torts (5th ed. 1984) § 11, p. 48.) Prosser reasoned ". . . it is not necessary that any damage result from [the false imprisonment] other than the confinement itself, [fn. omitted] since the tort is complete with even a brief restraint of the plaintiff's freedom." (*Ibid.*) Prosser further observed "[a]s in the case of other torts derived from the old action of trespass, the fact that there has been false imprisonment at all establishes a cause of action for at least nominal damages. [Fn. omitted.]" (*Ibid.*)[15]

b. *Other jurisdictions.*

Other than Prosser and the Restatements of Torts, there is very little authority on the subject to guide this court. Decisions in other jurisdictions purport to follow the Restatement and/or Prosser, but mischaracterize those texts. Further, no rationale is given for the positions taken by the various courts.

For example, *Broughton* v. *State* (1975) 37 N.Y.2d 451, 456 [373 N.Y.S.2d 451, 335 N.E.2d 310, 314], citing the Second Restatement, states

---

[14]This evolution of section 42 of the Restatement of Torts is noted in Perkins and Boyce, Criminal Law (3d ed. 1982) pages 228-229.

[15]Prosser's 1984 hornbook also criticized the Second Restatement for "denying recovery where . . . substantial damage results to the plaintiff from a confinement of which the plaintiff is unaware at the time. [Fn. omitted.]" (Prosser & Keeton, *supra*, § 11, p. 48.) However, this criticism was unfounded because the Second Restatement, unlike the original Restatement, allows recovery where the person physically restrained either "knows of the confinement *or is harmed by it.*" (Rest.2d Torts, § 42, p. 65, italics added; cf. Rest., Torts (1934) § 42.)

that to establish a cause of action for false imprisonment "the plaintiff must show that: . . . the plaintiff was conscious of the confinement." (Accord, *Parvi* v. *City of Kingston* (1977) 41 N.Y.2d 553 [394 N.Y.S.2d 161, 362 N.E.2d 960, 962].) Similarly, *Harrison* v. *Diversified Products Corporation* (Ala. 1986) 499 So.2d 1384, invokes the Second Restatement for the proposition that one claiming false imprisonment must establish "he was aware that he was being detained."

However, as discussed above, the Second Restatement allows recovery where the person physically restrained either "knows of the confinement *or is harmed by it.*" (Rest.2d Torts, § 42, p. 65, italics added.)

Another variation appears in *Creek* v. *State* (Ind.App. 1992) 588 N.E.2d 1319, 1320, which relies on the Second Restatement for the principle that "[i]n general, the victim must be cognizant of his or her imprisonment *or be physically harmed* by the confinement to recover damages for the tort[.]" (Italics added.) However, the Second Restatement does not require *physical* harm, merely harm, resulting from a confinement. (Rest.2d Torts, § 42, p. 65.)

Even more curious is *Blaz* v. *Molin Concrete Products Co.* (1976) 309 Minn. 382 [244 N.W.2d 277, 279], which cites both the Second Restatement and Prosser for its assertion "the elements of false imprisonment [include] . . . (3) awareness by the plaintiff that he is confined." However, as discussed above, Prosser consistently has argued that awareness by the plaintiff is not required, and the Second Restatement allows recovery, irrespective of lack of awareness, if the confinement has resulted in actual harm.

Given the dearth of persuasive authority in our sister states, we are compelled to make our own reasoned determination on the issue of the significance of a false imprisonment victim's state of mind.

 c. *Contemporaneous awareness of false imprisonment is not an essential element because harm may result even if the victim does not learn until afterward of the confinement or its wrongfulness.*

■ It is readily apparent a victim can sustain substantial harm as a consequence of a false imprisonment, even if not immediately cognizant of being wrongfully detained.

In *Sullivan* v. *County of Los Angeles* (1974) 12 Cal.3d 710, 714 [117 Cal.Rptr. 241, 527 P.2d 865], the plaintiff brought a *false imprisonment*

action against the county for the sheriff's failure to release him from jail following the completion of his sentence. The plaintiff was released only after writing to the superior court for a release order. (*Ibid.*) The main issue in *Sullivan* was whether the action was barred by governmental immunity and the Supreme Court held the county was not immune. (*Id.*, at p. 717.) However, *Sullivan* also can serve as the basis of an interesting hypothetical. Assuming arguendo the prisoner therein did not discover until *after* his release he had been wrongfully deprived of his liberty by being imprisoned beyond his release date, if contemporaneous awareness of the false imprisonment were an essential element of the tort, the plaintiff would be precluded from recovery.

An example of injury resulting from false imprisonment, where the victim is not even aware of the confinement, appears in the Restatement. "A, a diabetic, is suffering from shock brought on by an overdose of insulin. B believes A to be drunk, and without any legal authority to do so arrests A and locks him up over night in jail. In the morning A is released while still unconscious and unaware that he has been confined. On learning what has occurred A is greatly humiliated, and suffers emotional distress, with resulting serious illness. B is subject to liability to A for false imprisonment." (Rest.2d Torts, § 42, com. b, illus. 5, p. 66.)

Thus, a victim may be entirely unaware of confinement and still suffer harm as a result of the false imprisonment, as in the Restatement's example of the diabetic. Or, a victim may perceive the confinement, as in our example of the prisoner unknowingly incarcerated beyond his release date, yet not be contemporaneously aware the confinement was unlawful.[16] In either situation, the false imprisonment results in harm.[17]

Therefore, contemporaneous awareness of the false imprisonment is not, and need not be, an essential element of the tort. Such an arbitrary limitation would leave persons harmed by false imprisonment uncompensated, while allowing perpetrators of an intentional tort to escape liability. Instead, the relevant factor is whether the unlawful restraint or confinement resulted in

[16]The case before this court falls into the latter category. The girls were aware they were confined on the aircraft, yet they did not learn of the false imprisonment until afterward, when they discovered Critical Air impliedly had misrepresented its authority to transport them. Because "[t]here is no real or free consent when it is obtained through fraud . . . (Civ. Code, § 1567)" (*Turner* v. *Turner* (1959) 167 Cal.App.2d 636, 640 [334 P.2d 1011]), the girls' confinement on the aircraft was nonconsensual and therefore actionable as a false imprisonment.

[17]Particularly when the false imprisonment is achieved through fraud or deceit, the tortious conduct will not be discovered until later.

*harm.* This is essentially the view urged by Prosser. It is also the position of the Second Restatement, except that the Second Restatement disallows a cause of action where the harm is purely nominal. (Rest.2d Torts, § 42, com. a., p. 65.) In that limited respect, we take issue with the Second Restatement. It is that issue which is now examined.

3. *Nominal harm is sufficient to support a cause of action for false imprisonment.*

Here, the evidence established Erin and Laura suffered actual harm as a result of the false imprisonment. Nonetheless, due to some question as to whether physical injury is a prerequisite to recovery where the victim lacks contemporaneous awareness of the false imprisonment, the degree of harm necessary to give rise to a cause of action is addressed.

a. *California law authorizes a cause of action for false imprisonment even where the damage is purely nominal.*

Unlike the Second Restatement, the law of this state clearly allows a cause of action for false imprisonment notwithstanding the fact a plaintiff suffered merely nominal damage.

. Civil Code section 3360, enacted in 1872, states: "When a breach of duty has caused no appreciable detriment to the party affected, he may yet recover nominal damages." (See generally, 6 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 1316, p. 774.)

Pursuant to Civil Code section 3360, in the long-standing case of *Maher* v. *Wilson* (1903) 139 Cal. 514, 520 [73 P. 418], our Supreme Court held a victim of false imprisonment was entitled to recover nominal damages, despite the absence of any appreciable detriment. *Maher* observed "[t]he detention of plaintiff, . . . was a technical false imprisonment[.]" (*Id.*, at p. 518.) However, "[n]o actual damages were shown" (*id.*, at p. 517), so as to preclude compensatory damages, and there was "no evidence of malice or oppression" (*id.*, at p. 519), so as to preclude punitive damages. (*Id.*, at p. 520.) Nonetheless, the defendants had "incurred a technical liability, entitling the plaintiff to nominal damages." (*Ibid.*)

The BAJI committee also recognizes the availability of nominal damages for false imprisonment. The use note following current BAJI No. 7.60 (8th ed.), at page 358, states in relevant part: "If plaintiff is seeking nominal damages only, . . . [a] special damage instruction will have to be devised, such as, 'If you find that the defendant committed false [imprisonment] [or]

[arrest], plaintiff is entitled to nominal damages, that is, a trivial sum such as $1.00."

As previously noted, Prosser supplies a rationale for such an award, stating "[a]s in the case of other torts derived from the old action of trespass, the fact that there has been false imprisonment at all establishes a cause of action for at least nominal damages. [Fn. omitted.]" (Prosser & Keeton, Torts, *supra*, § 11, p. 48.) Therefore, ". . . it is not necessary that any damage result from it other than the confinement itself, since the tort is complete with even a brief restraint of the plaintiff's freedom." (*Ibid.*, fn. omitted.)

Also, false imprisonment has been characterized as a "dignitary tort," designed to allow recovery by one who either "knows of the dignitary invasion" or is actually harmed by it. (*Parvi* v. *City of Kingston, supra,* 41 N.Y.2d 553 [362 N.E.2d at p. 963].) The tort is intended to protect one's "personal interest in freedom from restraint of movement[.]" (*Jackson* v. *City of San Diego* (1981) 121 Cal.App.3d 579, 585 [175 Cal.Rptr. 395].) In view of the nature of the interest protected, it is appropriate a cause of action may be brought even where the damage is purely nominal.

As Witkin observes, "[t]he advantages of . . . an award [of nominal damages], other than psychological, are two: (1) The plaintiff is entitled to costs [citation]; (2) he may be entitled to punitive damages [citation]." (6 Witkin, Summary of Cal. Law, *supra,* Torts, § 1316, p. 774.)

b. *Other damages recoverable for false imprisonment.*

 Frequently, emotional distress is the primary injury resulting from an intentional tort such as false imprisonment, and that injury clearly is compensable.

In *Thing* v. *La Chusa* (1989) 48 Cal.3d 644, 650 [257 Cal.Rptr. 865, 771 P.2d 814], our Supreme Court stated: "With recognition of intentional infliction of emotional distress as a discrete tort cause of action, this court accepted both freedom from emotional distress as an interest worthy of protection in its own right, and the proposition that it is possible to quantify and compensate for the invasion of that interest through an award of monetary damages even when the severity of the emotional distress is not manifested in physical symptoms. 'If a cause of action is otherwise established, it is settled that damages may be given for mental suffering naturally ensuing from the acts complained of [citations], and in the case of many torts, such as assault, battery, *false imprisonment,* and defamation, *mental suffering will frequently constitute the principal element of damages.* [Citation.] In cases where mental suffering constitutes a major element of damages it is anomalous to deny recovery because the defendant's intentional

misconduct fell short of producing some physical injury.' [Citation.]" (Italics added.)

In addition to recovery for emotional suffering and humiliation, one subjected to false imprisonment is entitled to compensation for other result-ant harm, such as loss of time, physical discomfort or inconvenience, any resulting physical illness or injury to health, business interruption, and damage to reputation, as well as punitive damages in appropriate cases. (Prosser & Keeton, Torts, *supra*, § 11, pp. 48-49.)

Following our effort to clarify the essential elements of the tort, we shift our focus to Critical Air's contentions on appeal.

## II. *Resolution of Critical Air's contentions.*

### 1. *No merit to Critical Air's contention there was no false imprisonment as a matter of law.*

As noted, Critical Air argues it did not falsely imprison the girls because a plaintiff must be *contemporaneously* aware of force or the threat of force sufficient to cause him or her to be restrained. However, such aware-ness is not an essential element of the tort. Moreover, almost by definition, where the false imprisonment is accomplished by fraud, as in this case, the plaintiff will not be immediately cognizant of the false imprisonment.

Here, the evidence established the girls' consent to their confinement on the aircraft was procured through a misrepresentation by Critical Air as to its authority. The confinement therefore was nonconsensual. (Civ. Code, § 1567, *Turner* v. *Turner*, *supra*, 167 Cal.App.2d at p. 640.) Because "the tort consists of the ' "nonconsensual, intentional confinement of a person, without lawful privilege, for an appreciable length of time," ' " (*Fermino* v. *Fedco, Inc.*, *supra*, 7 Cal.4th at p. 715), the jury properly found Critical Air's conduct amounted to a false imprisonment.

### 2. *Deletion of force or threat of force from instruction to jury was proper.*

Critical Air avers the trial court prejudicially erred in deleting the elements of force or threat of force when it reinstructed the jury on false imprisonment, because force or the threat of force is an *essential* element of the tort. As discussed above, such a contention is unavailing.

As explained, false imprisonment may be completed through various means, including force or the threat of force. Here, there was no substantial

evidence Critical Air used force or the threat of force to confine the children. Instead, the Scofields' theory at trial was that the false imprisonment was brought about through fraud.[18] Accordingly, the trial court properly deleted the elements of force or threat of force in its modified instruction.

### 3. *Critical Air cannot complain the given instruction was overly general.*

Rather than force or the threat thereof to carry out the false imprisonment, the evidence showed a *concealment or nondisclosure* to Erin and Laura that the Critical Air plane was not the one authorized by their father to transport them.[19] However, the trial court did not specifically instruct the jury on false imprisonment effected through fraud. The issue becomes whether the lack of such an instruction is cognizable on appeal.

### a. *Critical Air's failure to request a more specific instruction forecloses the issue on appeal.*

Both false imprisonment instructions given by the trial court herein were correct statements of the law. The modified instruction, from which reference to force or threat had been deleted, merely was general in nature in that it did not specify any of the unlawful means by which false imprisonment may be accomplished, including fraud. However, the lack of a more specific instruction to the jury is unavailing to Critical Air at this juncture.

In a civil case, ". . . there ordinarily is no duty to instruct in the absence of a specific request by a party; *the exception is a complete failure to instruct on material issues and controlling legal principles which may amount to reversible error.* [Citations.]" (*Agarwal* v. *Johnson* (1979) 25 Cal.3d 932, 951 [160 Cal.Rptr. 141, 603 P.2d 58], italics added.) Thus, it is "settled that a party may not complain on appeal that an instruction correct in law is too general or incomplete unless he had requested an additional or qualifying

---

[18] In objecting to the giving of BAJI No. 7.60 as written, the Scofields' counsel stated: "In particular, I'm concerned about the sentence in 7.60 which states, 'The restraint necessary to constitute false imprisonment may result either from the exercise of force or from express or implied threat of force.' And as I think I indicated before, I think that *the restraint [also] can be as a result of misrepresentations or fraud or absence of authority from the parent or guardian.* A person who drives by the street and picks up a child without authority from anybody is guilty of false imprisonment, even though the child voluntarily got in the car." (Italics added.)

[19] Generally, the necessary elements of a cause of action for fraud are: "(1) misrepresentation (false representation, *concealment, or nondisclosure*); (2) knowledge of falsity (scienter); (3) intent to defraud (i.e., to induce reliance); (4) justifiable reliance; and (5) resulting damage." (*Molko* v. *Holy Spirit Assn.*, *supra*, 46 Cal.3d at p. 1108, italics added.)

instruction." (*Id.*, at p. 948.) When a trial court "gives a jury instruction which is correct as far as it goes but which is too general or is incomplete for the state of the evidence, a failure to request an additional or a qualifying instruction will waive a party's right to later complain on appeal about the instruction which was given. [Citation.]" (*Suman* v. *BMW of North America, Inc.* (1994) 23 Cal.App.4th 1, 9 [28 Cal.Rptr.2d 133].)

██ Critical Air did not request a more specific instruction below. Even on appeal, Critical Air does not contend the trial court should have instructed the jury that false imprisonment may be effected through fraud. Instead, Critical Air continually has maintained that force or the threat of force is the exclusive means by which false imprisonment can be accomplished, contrary to abundant California law on the subject. Because Critical Air did not seek a more specific instruction, the trial court properly discharged its duty by giving the jury a basic instruction on false imprisonment. As set forth in footnote 7, *ante*, the instruction given by the trial court *did* inform the jury false imprisonment is the unlawful violation of the personal liberty of another, and that to constitute the tort, there must be intentional and unlawful confinement or detention which compels the person to stay or go somewhere against his or her will.[20]

Further, and in any event, the jury could not have been misled by the generic instruction because the closing arguments of both counsel clearly addressed whether there had been a false imprisonment achieved through fraud.[21] Because the Scofields' theory at trial was that the false imprisonment was accomplished through fraud, not force or the threat of force, the only rationale by which this jury could have found for the Scofields was by finding a false imprisonment perpetrated by fraud. This record contains substantial evidence to support the jury's determination on general verdicts.

 b. *Inadequacy of BAJI No. 7.60.*

It would appear some of the difficulties the parties and the trial court had with the trial of this matter stemmed from the fact the standard BAJI

---

[20]Because the trial court did not give an erroneous instruction, nor did it refuse a proper instruction sought by Critical Air, there is no judicial error to be scrutinized for prejudice under the principles enunciated in *Soule* v. *General Motors Corp.* (1994) 8 Cal.4th 548, 570-583 [34 Cal.Rptr.2d 607, 882 P.2d 298].

[21]The Scofields' counsel argued to the jury, inter alia: "The instruction further goes on to say, 'To constitute a false imprisonment, there must be an intentional and unlawful'—intentional, certainly there was here. Unlawful, not telling the truth, deception, interfering with other people's rights is unlawful. Fraud is what it is."

To resist the fraud argument, Critical Air's counsel argued the girls "wanted to go on the plane with their brother, . . . they wanted to get home and they assumed that was the appropriate airplane. . . . Now, if they didn't know . . . they were on the wrong plane . . . then it couldn't really have an effect on their emotions or cause any damage."

instruction on false imprisonment, BAJI No. 7.60, solely addresses false imprisonment being completed through force or the threat of force. Clearly, the standard BAJI instruction is inadequate because it does not cover fact situations where the false imprisonment is brought about by other well settled means, such as fraud, deceit or unreasonable duress. (See Pen. Code §§ 236, 237; *Molko* v. *Holy Spirit Assn.*, *supra*, 46 Cal.3d at p. 1123; *Fermino* v. *Fedco, Inc.*, *supra*, 7 Cal.4th at p. 715.)

Until the BAJI committee addresses the omission, the preface to BAJI is pertinent. It reminds "the bench and bar . . . that lawyers still have an obligation to present their own instructions, *particularly in areas where BAJI hasn't written*, and that judges still have an obligation to give serious consideration to those non-BAJI instructions that counsel offer." (BAJI (8th ed.) p. X, italics added.) Also relevant in such cases is the Judicial Council's recommendation that "[w]henever the latest edition of BAJI . . . *does not contain an instruction on a subject upon which the trial judge determines that the jury should be instructed*, or when a BAJI . . . instruction cannot be modified to submit the issue properly, the instruction given on that subject should be simple, brief, impartial and free from argument." (Cal. Standards Jud. Admin., § 5 [Deering's Cal. Ann. Codes, Rules (1996 ed.) p. 2328], italics added.)

### 4. *Damage award was not excessive.*

██ With respect to Critical Air's contention the $120,000 damage award to the girls was excessive, we note at the outset that Critical Air did not present any evidence to controvert Dr. Long's conclusion the girls would suffer long-term harm due to the deception.

██ Further, in approaching the issue, we are mindful "[t]he amount of damages is a fact question, first committed to the discretion of the jury and next to the discretion of the trial judge on a motion for new trial. . . . [A]ll presumptions are in favor of the decision of the trial court [citation]. The power of the appellate court differs materially from that of the trial court in passing on this question. An appellate court can interfere on the ground that the judgment is excessive only on the ground that the verdict is so large that, at first blush, it shocks the conscience and suggests passion, prejudice or corruption on the part of the jury." (*Seffert* v. *Los Angeles Transit Lines* (1961) 56 Cal.2d 498, 506-507 [15 Cal.Rptr. 161, 364 P.2d 337]; accord, *Kelly-Zurian* v. *Wohl Shoe Co.* (1994) 22 Cal.App.4th 397, 410 [27 Cal.Rptr.2d 457].)

██ Given the uncontroverted evidence with respect to psychological harm, the $120,000 which the jury awarded to Erin and Laura is not so large

a sum as to reflect passion, prejudice or corruption by the jury. Therefore, we decline to interfere with said damage award, which the trial court left undisturbed on the motion for new trial.[22]

DISPOSITION

The judgment is affirmed. The Scofields to recover costs on appeal.

Croskey, J., and Kitching, J., concurred.

A petition for a rehearing was denied June 19, 1996, and the opinion was modified to read as printed above. Appellants' petition for review by the Supreme Court was denied August 28, 1996.

---

[22]Critical Air also contends the damage award is infirm because the girls were awarded damages for the deception and not the confinement. Critical Air cites *Sullivan* v. *County of Los Angeles, supra,* 12 Cal.3d at page 716, for the proposition that "[i]n a false imprisonment case, the 'injury' suffered by an individual is the illegal confinement itself rather than any detriment occurring after imprisonment[.]" The quoted language from *Sullivan* is taken entirely out of context from a discussion of whether a county is immune from a false imprisonment suit by an individual who already was confined in jail at the time the false imprisonment occured. (*Id.,* at pp. 716-717.) In that regard, *Sullivan* concluded "[c]ontinued confinement cannot legally make [one] a 'prisoner' when [one's] jail term has expired; in the eyes of the law plaintiff is no longer a prisoner.'" (*Id.,* at p. 717.) *Sullivan* does not support Critical Air's contention that the girls were not entitled to recover for any resultant harm which was manifested after the false imprisonment ended.