[No. H017027. Sixth Dist. Feb. 1, 1999.]

LINDA WHITE et al., Plaintiffs and Respondents, v.
INBOUND AVIATION et al., Defendants and Appellants.

COUNSEL

Bailey & Marzano, Stephen L. Nelson and J. Douglas Durham for Defendants and Appellants.

Law Office of Gary L. Simms, Gary L. Simms; O'Reilly, Collins & Danko, O'Reilly & Collins, Terry O'Reilly and Michael S. Danko for Plaintiffs and Respondents.

OPINION

**MIHARA, J.**—The industry standard in the aircraft rental business requires a pilot to complete a "high altitude checkout" before being permitted to rent an aircraft for a flight to a "high altitude" airport. Although defendant Inbound Aviation had a policy incorporating just such a requirement, it knowingly permitted a young inexperienced pilot who had not completed a high altitude checkout to rent an airplane for a flight to the South Lake Tahoe airport, a challenging and dangerous high altitude airport. Due to his inexperience and lack of requisite knowledge and skill, the pilot made a very

basic error and crashed the aircraft while attempting a takeoff from the South Lake Tahoe airport. The crash killed the pilot and his two passengers. The parents of one of the passengers sued defendant Inbound Aviation, the partners who owned Inbound Aviation, the owner of the aircraft and the pilot. The jury returned a verdict in favor of the parents. Defendants (other than the pilot) appeal and claim that (1) the jury's verdict is not supported by the evidence because there is no evidence that the pilot was not "competent," (2) the jury instructions were confusing and prejudicially erroneous, (3) the verdict against the owner of the aircraft was erroneous because the evidence did not support it and it was based on improperly given jury instructions and (4) the trial court erroneously failed to limit the amount of damages assessed against the owner of the aircraft for his vicarious liability. We modify and affirm the judgment.

## FACTS

Defendant Inbound Aviation (hereafter Inbound) is a partnership which, among other things, leases aircraft from owners and rents out the aircraft to pilots. One of the aircraft leased by Inbound was a Piper Archer owned by Jeffrey Marconet. Jeffrey Marconet was also an Inbound employee who was the manager of the company's "day-to-day" operations. John Rosselott was employed by Inbound as a flight instructor. Inbound's policy was to require each individual who wished to rent an aircraft to complete a "checkout" in the type of aircraft the individual wished to rent. These checkouts were given by Inbound flight instructors. An Inbound employee would review the individual's logbook as part of the checkout procedure. The checkout included an hour- to an hour-and-a-half long "flight check" during which the individual's skill at piloting the aircraft was evaluated and the individual was informed by the flight instructor "what the airplane is capable of and not capable of." The individual was required to pay for aircraft rental and the flight instructor's time during the flight check. Inbound kept a record of the successful completion of a checkout in a file it maintained on each individual. This file also contained copies of the individual's license and medical certificate. The completion of the checkout would also be recorded in the individual's logbook.

The Federal Aviation Administration (FAA) imposes no special requirements on private pilots with respect to high altitude airports. Once a private pilot has obtained a license, this license may be retained so long as the pilot demonstrates his or her general "proficiency" to a flight instructor at least once every two years. However, because airplanes do not perform as well at high altitudes, Inbound required an individual who wished to fly an aircraft to a "high altitude airport" to complete a "high altitude checkout." Most, but

not all, businesses that rent aircraft require high altitude checkouts. The "good" ones have this requirement. Inbound defined "high altitude airport" as any airport over 4,000 feet. High altitude airports are "dangerous," and the South Lake Tahoe airport is particularly dangerous and has a history of a high "density of crashes." This is due to both the high altitude and the mountains that surround the South Lake Tahoe airport. At high altitudes, the aircraft's engine will produce less horsepower, its performance may be greatly degraded by high temperatures, the fuel-air mixture must be adjusted and mountain downdrafts can be much more dangerous.

During an Inbound high altitude checkout, the individual was informed about the differences between an aircraft's performance at sea level and its performance at high altitude. The individual was also given a high altitude flight check. This flight check included a flight to a high altitude airport. One purpose of the high altitude checkout procedure was to provide the individual with the requisite "skills" so that he or she "can make [his or her] own decisions" at a high altitude airport. These skills included takeoff and landing decisions such as whether or not to use the aircraft's flaps during these procedures. The point was to provide the individual with "actual hands-on experience" in high altitude conditions. The high altitude checkout procedure took about four to five hours. Inbound recorded an individual's completion of a high altitude checkout in Inbound's file on the individual and in the individual's logbook. Inbound employees were required to check an individual's file before releasing an aircraft to the individual. However, Inbound did not require its employees to verify that an individual had received a high altitude checkout before releasing an aircraft for a flight to a high altitude airport. Instead, Inbound relied on the individual to complete this requirement in compliance with Inbound's policy. Inbound informed each individual of the high altitude checkout requirement at the time of the initial checkout.

In March 1994, Charles Meier completed an Inbound checkout in a Piper Archer aircraft with Rosselott as his flight instructor. Although Meier's flying experience, as reflected in his logbook, included flights into and out of "high altitude" airports in Arizona, he had no experience flying into or out of any high altitude airport that was surrounded by mountains. Although Meier and Rosselott briefly discussed the use of flaps, Rosselott did not discuss with Meier whether it was appropriate to use flaps for high altitude takeoffs "because we weren't doing high altitude checkout." Rosselott told Meier that Inbound would require Meier to complete a high altitude checkout before Inbound would rent him an aircraft to fly to a high altitude airport. Rosselott perused Meier's logbook, which contained a complete record of Meier's flight experience, and noted that Meier was a "brand new

pilot" with a total of about 75 hours of flying experience who had not flown for about 18 months since receiving his license. Meier had only 23 hours of "solo" flight experience, that is, without the presence of a flight instructor. The only airport listed in Meier's logbook with which Rosselott was familiar was the Prescott, Arizona airport. Rosselott thought that Meier "flew adequately" during the checkout with "average" takeoffs and landings which "showed a low level of skill." Meier appeared to have learned to "fly by rote" rather than to make judgment decisions. Nevertheless, Rosselott signed off on Meier's checkout and approved him for rental of a Piper Archer from Inbound.

Twice in the next two months, Meier rented a Piper Archer from Inbound and flew, on each occasion, for less than an hour. On July 2, 1994, Meier rented Marconet's Piper Archer from Inbound. He took two passengers and luggage with him in the aircraft. One of Meier's passengers was Mark White. Before Meier was permitted to fly the aircraft, Rosselott and two other Inbound employees learned that Meier was planning to fly to the South Lake Tahoe airport. Rosselott knew that he had not given Meier a high altitude checkout, but he did not check Meier's file to confirm whether Meier had completed a high altitude checkout with another flight instructor. In fact, Meier had not completed a high altitude checkout, and Inbound's file on Meier did not show that he had done so. Rosselott assumed that, since Meier was aware of the high altitude checkout requirement, Meier had complied with the requirement and completed a high altitude checkout. Jeffrey Marconet provided Meier with the keys to the aircraft.

When Meier attempted to take off from the South Lake Tahoe airport, the aircraft crashed. The crash was caused by Meier's "mismanagement of the aircraft" which caused the aircraft to stall. Proper "management" of the aircraft would have prevented the crash from occurring. Meier's takeoff procedure would have been appropriate at a sea level airport. However, he attempted to take off from a high altitude airport on a hot day with "25 degrees of flaps." The heat and altitude reduced the aircraft's power by more than 25 percent, and the use of flaps only exacerbated the power loss by creating additional drag. The "effect of flaps" and the fact that flaps "degrade climb performance" are part of "basic aerodynamics." It is "not a good idea" to use flaps at high altitude, and any reasonably competent pilot who had received a high altitude checkout would not have used flaps in a Piper Archer for a high altitude takeoff. Meier and his passengers, including Mark White, were killed in the crash.

### PROCEDURAL BACKGROUND

Mark White's parents filed an action against Inbound, Gregory Marconet and Michael Lambert (the two partners who owned Inbound), Jeffrey Marconet and the estate of Charles Meier. They alleged that Inbound and Jeffrey

Marconet had negligently entrusted the aircraft to Meier for a flight to a high altitude airport without ensuring that Meier had completed a "high altitude checkout" in advance of the flight. Defendants answered the complaint with a general denial. Jeffrey Marconet asserted as an affirmative defense that his liability as owner of the aircraft was limited by Public Utilities Code section 21404.1.

At trial, plaintiffs' expert testified that Meier's "competency" to make "the flight to Lake Tahoe" was "impossibly low." He believed that Meier was "desensitized" to the conditions that he should have anticipated at the South Lake Tahoe airport and lacked the "maturity of judgment" to deal with these conditions due to his inexperience. Although Meier had satisfied FAA requirements to obtain a pilot's license, plaintiffs' expert testified that Meier "was not competent" to fly an aircraft into and out of the South Lake Tahoe airport. This expert also expressed the opinion that a pilot could not be considered "proficient" or "competent" if the pilot had not flown in the last 90 days. At the close of plaintiffs' case-in-chief, defendants moved for nonsuit on the ground that there was no evidence of Meier's incompetence. The court denied this motion.

Defendants presented evidence that Meier had been taught about high altitude takeoffs and about the use of flaps when he was in training for his pilot's license. They also adduced evidence that Meier had flown without incident twice in May 1994 into and out of low altitude airports. Defendants also called an expert witness who testified that Meier's successful completion of Rosselott's March 1994 checkout established his competency to pilot a Piper Archer. This expert opined that Inbound's checkout procedures met the standard of care in the aircraft rental business. Defendants also presented evidence that Meier had taken some safety precautions prior to attempting the takeoff from the South Lake Tahoe airport. When Meier prepared to leave South Lake Tahoe, he requested that the aircraft be fueled only "to the tabs" in an apparent effort to keep the aircraft's weight as low as possible. Meier prepared a flight plan for his return flight. He was provided with a "handout" on the subject of "density altitude and take-off procedures at South Lake Tahoe" by a South Lake Tahoe airport employee. A South Lake Tahoe airport employee testified that there had been no major takeoff accidents at South Lake Tahoe airport for nearly four years prior to July 1994.

The jury returned unanimous special verdicts finding that (1) Meier had been negligent, (2) his negligence had caused Mark White's death, (3) Inbound had permitted Meier to use the aircraft when it knew or should have known that he was "not competent" to operate the aircraft, (4) Meier's

incompetence had caused the accident, (5) 50 percent of the negligence that had caused Mark White's death was attributable to Inbound and the other 50 percent was attributable to Meier and (6) the total amount of damages was $890,000. The jury also made a unanimous special finding that Jeffrey Marconet had permitted Meier to use the aircraft when he knew or should have known that Meier was "not competent" to operate the aircraft. The court entered judgment on the jury's verdicts and finding. It ordered Jeffrey Marconet and Meier's estate to pay $445,000 in damages and Inbound, Lambert, Gregory Marconet and Jeffrey Marconet to pay damages of $445,000 to plaintiffs. Defendants' motion for a new trial was denied. Defendants (other than Meier's estate) filed a timely notice of appeal.

. DISCUSSION

I. *Judgment Against Inbound*

A. *Sufficiency of the Evidence*

█ Defendants claim that there was no evidence that Meier was not "competent" within the meaning of that term as it is used in the elements of negligent entrustment.

█ "Liability for negligent entrustment is determined by applying general principles of negligence, and ordinarily it is for the jury to determine whether the owner [or other entruster] has exercised the required degree of care." (*Allen* v. *Toledo* (1980) 109 Cal.App.3d 415, 421 [167 Cal.Rptr. 270].) The seminal case on negligent entrustment is *Rocca* v. *Steinmetz* (1923) 61 Cal.App. 102 [214 P. 257]. "In its simplest form the question is whether the owner [or other supplier] when he permits an incompetent or reckless person, whom he knows to be incompetent or reckless, to take and operate his car [or any other instrumentality], acts as an ordinarily prudent person would be expected to act under the circumstances."[1] (61 Cal.App. at p. 109.) California courts have long held that inexperience *alone* does not *necessarily* establish incompetency. (*Krawitz* v. *Rusch* (1989) 209 Cal.App.3d 957, 966 [257 Cal.Rptr. 610]; *Boyd* v. *White* (1954) 128 Cal.App.2d 641, 656 [276 P.2d 92] [student pilot is not per se incompetent].) It is necessarily a

---

[1]The Restatement Second of Torts sets forth a similar standard. "One who supplies directly or through a third person a chattel for the use of another whom the supplier knows or has reason to know to be likely because of his youth, inexperience, or otherwise, to use it in a manner involving unreasonable risk of physical harm to himself and others whom the supplier should expect to share in or be endangered by its use, is subject to liability for physical harm resulting to them." (Rest.2d Torts, § 390.) The examples given in the comments to section 390 include the situation where the person to whom the chattel was entrusted "lacks the training and experience necessary for such use . . . ." (§ 390, com. b, at p. 315.)

question for the jury whether a prudent person, aware of the facts known to the supplier of the instrumentality, would have permitted the individual to operate the instrumentality.

 Defendants argue that Meier was "competent" as a matter of law because he was "legally qualified" to pilot an aircraft by virtue of his possession of a pilot's license. They argued this point to the jury, and the jury rejected their claim that possession of a license necessarily established that Meier was "competent." The word "competent" is a fairly broad term which can have several different meanings. It is commonly understood to mean "having requisite or adequate ability or qualities" or "legally qualified or adequate." (Webster's New Collegiate Dict. (10th ed. 1993) pp. 234-235.) Similarly, the word "incompetent" is commonly understood to mean "inadequate to or unsuitable for a particular purpose," "lacking the qualities needed for effective action" or "not legally qualified." (Webster's New Collegiate Dict., *supra*, p. 588.) Defendants have seized on the narrowest of these alternative definitions. We do not believe that the general principles of negligence which govern the tort of negligent entrustment are so limited. If a supplier of a chattel is aware of facts which establish that an individual lacks the ability to safely use the chattel for a particular purpose, and the supplier nevertheless entrusts the chattel to that individual to use *for that purpose*, the supplier has acted imprudently and should be held accountable if harm arises from the individual's inadequacy.

 Defendants also challenge the sufficiency of the expert testimony presented at trial by plaintiffs. They claim that plaintiffs' expert improperly equated "competence" and "proficiency." While these two terms are not synonymous, plaintiffs' expert made it clear during his testimony that it was his opinion that Meier did not have the requisite flying ability to fly into and out of the South Lake Tahoe airport. Defendants did not object to this expert's testimony, and they utilized cross-examination to support their claim that lack of "proficiency" was an inappropriate basis for a finding of incompetence. The expert's testimony was sufficient to support a finding that Meier was not competent to fly into and out of the South Lake Tahoe airport.

In defendants' view, "[t]he concept of competence, in the negligent entrustment context, necessarily implies the *minimum* degree of skill required to operate the chattel."[2] This view ignores the importance of the facts. If a supplier of an automobile is aware that a driver with minimal skill

[2]Defendants present some examples which disprove their point. They assert that "[i]f a low level of experience, alone, is sufficient to establish incompetence, then . . . every newly licensed physician and attorney, must be presumed incompetent until they achieve some

intends to utilize the vehicle for a *specific* purpose for which the driver lacks the requisite skill, it would be imprudent for the supplier to entrust the vehicle to this driver for this specific purpose. On the other hand, if the supplier lacks awareness of the purpose to which the driver intends to put the vehicle, the supplier would not be liable for negligent entrustment based on the driver's lack of skills other than those minimally necessary to safely drive the vehicle. The information available to the supplier about the individual and his or her purpose in obtaining the chattel determines whether the supplier acts imprudently in supplying the chattel.

The evidence produced at trial was sufficient to support the jury's liability verdict against Inbound. Inbound was aware that Meier was a brand new pilot with very little solo experience and no flying experience at any high altitude airport surrounded by mountains.[3] Inbound's knowledge included the fact that Meier had only flown five times since receiving his pilot's license nearly two years earlier. It had also learned that Meier had a "low skill level" and seemed to have learned to fly "by rote." Inbound knew that Meier intended to fly the Piper Archer to the South Lake Tahoe airport. The South Lake Tahoe airport is known to be, at best, a challenging airport and, at worst, a dangerous airport. Because high altitude airports in California, many of which are surrounded by mountains, can challenge a pilot's skills, Inbound had an industry-standard high altitude checkout policy. This policy required an individual who wished to rent an aircraft to fly into and out of high altitude airports to complete an exercise which both taught the individual how to safely operate an aircraft at such airports and also tested the individual's skill in doing so under actual high altitude conditions at a high altitude airport.

If Meier had completed Inbound's high altitude checkout, he would have been taught the skills necessary to make proper takeoff and landing decisions at a high altitude airport, including whether to use flaps during such procedures. Notwithstanding its awareness of the dangers associated with high altitude airports and its industry-standard policy requiring a high altitude checkout to alleviate some of these dangers, Inbound knowingly permitted a pilot with questionable flying skills and judgment, minimal solo

undefined level of experience." Not so. An inexperienced doctor or lawyer would not be "presumed" incompetent, but an inexperienced doctor might well be incompetent to perform complicated brain surgery and an inexperienced lawyer would almost necessarily be considered incompetent to handle a complex death penalty trial. Again, it is the specific facts of the task that the individual is to perform that determines whether the individual is competent, that is has the ability, to perform that task.

[3] "As against a principal, both principal and agent are deemed to have notice of whatever either has notice of, and ought, in good faith and the exercise of ordinary care and diligence, to communicate to the other." (Civ. Code, § 2332.) Inbound had notice of these facts because Rosselott, Inbound's employee-agent, had notice of them.

flying experience, little recent flying experience and no experience flying to any high altitude airport surrounded by mountains to fly the Piper Archer into and out of the South Lake Tahoe airport. On these facts, a jury certainly could have concluded that Meier was not competent to so use the aircraft entrusted to him by Inbound and that Inbound was aware of his incompetence. Since the crash was caused by a basic error which demonstrated Meier's lack of the knowledge and ability to utilize appropriate procedures for takeoff from a high altitude airport surrounded by mountains, Inbound's liability for negligent entrustment was supported by the evidence.

### B. *Instructions*

Defendants argue that the trial court's instructions on negligent entrustment were prejudicially erroneous.

### 1. *Proceedings Below*

Plaintiffs asked the trial court to give a modified version of BAJI No. 13.80 which referred to "the planned flight." Defendants also requested a special instruction based on BAJI No. 13.80. The court rejected both of these requests and decided to give an instruction which was an essentially unmodified version of BAJI No. 13.80. However, when the court orally instructed the jury, it first erroneously read the rejected modified version of the instruction that had been requested by plaintiffs. "One who permits an aircraft to be used by a pilot he knows or from facts known to him—let's see—one who permits an aircraft to be used by a pilot he knows, or from facts known to him should know, is not competent to make the planned flight—is liable for injuries resulting from the negligent operation of the aircraft, cause of which was the pilot's lack of competence."

The record contains no evidence of a contemporaneous objection by defendants to the court's mistaken reading of this instruction. After the court had read a few other instructions, it summoned counsel to the bench. The court then continued to instruct the jury with all but the concluding jury instructions. At that point, the court again summoned counsel to the bench. The court then gave an essentially unmodified version of BAJI No. 13.80. "One who permits an aircraft to be used by a pilot he knows, or from facts known to him should know, is not competent to operate the aircraft or the airplane, is liable for injuries resulting from the negligent operation of the aircraft the cause of which was the pilot's lack of competence." A similar version of BAJI No. 13.80 was also included with the written instructions given to the jury. The written instruction read: "One who permits an aircraft to be used by another person who he/she knows, or from facts known to

him/her should know, is not competent to operate the aircraft, is liable for injuries resulting [f]rom the negligent operation of the aircraft a cause of which was the incompetence of the person permitted to use the aircraft."

Plaintiffs argued in their opening statement that Meier was "competent" to fly into and out of "sea level airports" but "was not competent to fly [the aircraft] on the day he did with the passengers he had with the weight he was carrying to South Lake Tahoe." "I am not saying that Meier—under all circumstances anywhere—was an incompetent pilot. He had his license and, sure, he was able to fly under other circumstances without too much of a problem. [¶] He was not competent for this flight under these conditions on this day." They argued that Inbound acted negligently in permitting Meier "to take a flight that was beyond his capabilities."

Defendants responded by arguing that plaintiffs had failed to prove their case because they had not shown that Meier was "an incompetent pilot." "[Plaintiffs] must prove that Charles Meier was an incompetent pilot. Not just for this flight. The instructions read by the court says [sic] incompetent pilot." "[They] must prove he was not competent as a pilot—not merely for the high altitude at Lake Tahoe but not competent overall as a pilot . . . ." "[C]ompetence is not defined . . . . There is no standard definition. You, the jury, have to determine the issue of competence." Defense counsel then stated that he had looked the word competence up in several dictionaries and determined that it meant "duly qualified, meeting all the requirements, possessing legal qualifications that have a legal capacity or adequacy. [¶] In other words, being capable of doing it." He argued that Meier was "competent" because he possessed a pilot's license, the only legal requirement necessary to pilot the Piper Archer.

Plaintiffs reiterated in their closing argument that the issue they were placing before the jury was not whether Meier was competent in general to pilot an aircraft but whether Meier was competent to "operate the aircraft that he operated on the day he operated it and in the manner in which he operated it under the conditions he experienced . . . on July 3rd with three people on board going to Lake Tahoe."

The court instructed the jury that the jury instructions which it had given orally "will be made available in written form if you so request for your deliberations" and "[y]ou are to be governed only by the instruction in its final wording."

After the jury had retired to deliberate, the trial court made a record of the bench conference which had taken place during jury instructions. The court

explained that it had mistakenly given plaintiffs' requested and rejected modified version of BAJI No. 13.80 that included the words "planned flight" instead of the instruction it had intended to give. Defendants had objected during the bench conference. "Counsel asked me *not to strike it*, but, rather, to read the instruction again without the phrase 'planned trip' [*sic*] because it is—it is possible under your theory of the case that if—if it was—if you could—or the jury could find that Inbound knew of the destination, there would be a basis for them to deny the airplane to him." (Italics added.) The court had done as defense counsel asked and reread the instruction without the "planned flight" language.

A written instruction which was substantially similar to the reread instruction was included in the set of instructions provided to the jury for its use during its deliberations. During deliberations, the jury submitted a written question to the court asking "does the word competent refer to: competent to fly to Lake Tahoe or just competent to fly the aircraft in general." The court responded in writing: "All three lawyers argued this point to you. Refer to the instructions and continue your deliberations."

### 2. *Analysis*

Defendants argue that the trial court's instructions "confused the jury because they provided no standard for determining Meier's competence." They assert that the court's reading of two different versions of BAJI No. 13.80 confused the jury and the court's response to the jury's question compounded the jury's confusion.

Defendants' contentions have no merit. If they are claiming that the trial court erred in failing to give a more specific or elaborate instruction on the meaning of "competence," they waived this claim by failing to request such an instruction at trial. " 'If the law applicable to the facts of a case is stated correctly in a general charge to the jury, a party may not, in the absence of a request for a more specific or elaborate instruction, complain that a more specific or elaborate instruction should have been given.' . . ." (*Tabata* v. *Murane* (1944) 24 Cal.2d 221, 228 [148 P.2d 605], citations omitted; accord, *Townsend* v. *Butterfield* (1914) 168 Cal. 564, 569 [143 P. 760].)

If defendants are maintaining that the court's initial reading of plaintiffs' requested "planned flight" instruction was prejudicially erroneous, this claim is equally without merit. As we have explained in our discussion of the sufficiency of the evidence, the purpose for which the aircraft was rented, insofar as it was known to defendants, *was* pertinent to the question of whether defendants were liable for negligent entrustment. Consequently, plaintiffs' requested instruction was not prejudicially erroneous.

Furthermore, it was only at defendants' behest that the trial court did not strike the "planned trip" instruction that it had mistakenly read to the jury. In accordance with defendants' explicit request, the trial court read the unmodified instruction to the jury and included the written unmodified instruction with the instructions given to the jury for use during its deliberations. The trial court's response to the jury's question directed them solely to the written instruction about which defendants have no complaint.

The trial court's mistaken reading of a legally unobjectionable instruction followed by other legally unobjectionable instructions given in response to defendants' explicit request does not establish that the trial court prejudicially erred.

## II. *Judgment Against Jeffrey Marconet*

In their opening statement, plaintiffs pointed out that Jeffrey Marconet was both an Inbound employee and the owner of the aircraft. After the close of evidence, plaintiffs requested that the jury be asked to make a special finding as to Jeffrey Marconet's liability for negligent entrustment. Defendants asserted that Jeffrey Marconet's conduct in renting the aircraft to Meier was solely as an Inbound employee and therefore could not support personal liability for negligent entrustment. Defendants stipulated that, under Public Utilities Code section 21401.1, Jeffrey Marconet was vicariously liable as the owner of the aircraft for Meier's negligence, but that liability was limited to $15,000. Plaintiffs argued that the special finding was needed because it would permit the jury to find Jeffrey Marconet liable not simply as an owner but also as a "negligent entruster." Defendants offered to stipulate to a judgment of $15,000 against Jeffrey Marconet based on vicarious liability, but plaintiffs rejected the stipulation because they wished to seek a larger verdict against Jeffrey Marconet for negligent entrustment. The trial court stated that it would enter judgment in favor of plaintiffs for $15,000 if the jury returned a verdict finding Jeffrey Marconet vicariously liable as the owner of the aircraft.

At the instruction conference, plaintiffs argued that Jeffrey Marconet could be found liable in three different ways: (1) as Inbound's agent, (2) vicariously liable as owner of the aircraft and (3) personally liable for negligent entrustment "irrespective of whether Inbound is liable." Defendants did not challenge these assertions. The court noted that the jury could then allocate damages so that "you could wind up with Charles Meier with 30 percent, Inbound with 30 percent, and Jeffrey Marconet with 30 percent." The court asked plaintiffs if they wanted "damages allocated against Jeffrey Marconet?" Plaintiffs pointed out that, as plaintiffs, they did not want

damages allocated at all. Plaintiffs asked defendants to stipulate that "if Inbound negligently entrusted the aircraft then Jeffrey Marconet also negligently entrusted the aircraft." Defendants declined to so stipulate. The court then proposed that the jury be asked to allocate damages among Meier, Inbound and Jeffrey Marconet. All counsel subsequently stipulated that the verdict form would include a special finding regarding Jeffrey Marconet's liability for negligent entrustment but the jury would not be asked to apportion any damages to Jeffrey Marconet.

Plaintiffs argued to the jury that "someone who controls the keys to an airplane has an obligation" and "is not supposed to give those keys to someone that he knows or should know is not competent to fly that aircraft." In response, defendants argued that Jeffrey Marconet "acted in a dual role here." "Partly he was registered owner of the airplane leased to Inbound Aviation and he was an employee of Inbound Aviation. [¶] There is one thing as far as Jeffrey Marconet's statutory liability as owner of the airplane that the judge has instructed you on and I will discuss with you. [¶] But as to anything Jeffrey Marconet did in the course of acting as the manager of Inbound, that too, all gets lumped under the Inbound label."

### A. *Sufficiency of the Evidence*

Defendant Jeffrey Marconet challenges the sufficiency of the evidence to establish that (1) he knew of Meier's destination when he entrusted the aircraft to Meier and (2) he had any control over the aircraft when he entrusted the aircraft to Meier.

■ " 'When a finding of fact is attacked on the ground that there is not any substantial evidence to sustain it, the power of an appellate court *begins* and *ends* with the determination as to whether there is any substantial evidence contradicted or uncontradicted which will support the finding of fact.' " (*Foreman & Clark Corp.* v. *Fallon* (1971) 3 Cal.3d 875, 881 [92 Cal.Rptr. 162, 479 P.2d 362], italics in original; accord, *Gray* v. *Don Miller & Associates, Inc.* (1984) 35 Cal.3d 498, 503 [198 Cal.Rptr. 551, 674 P.2d 253, 44 A.L.R.4th 763].) " '[W]e have no power to judge of the effect or value of the evidence, to weigh the evidence, to consider the credibility of the witnesses, or to resolve conflicts in the evidence or in the reasonable inferences that may be drawn therefrom.' . . ." (*Leff* v. *Gunter* (1983) 33 Cal.3d 508, 518 [189 Cal.Rptr. 377, 658 P.2d 740], citation omitted.) Our role is limited to determining whether the evidence before the trier of fact supports its findings. (*Reddy* v. *Gonzalez* (1992) 8 Cal.App.4th 118, 123 [10 Cal.Rptr.2d 55].)

### 1. *Knowledge of Destination*

■ Defendant Jeffrey Marconet argues that there was not substantial evidence that he was aware of Meier's destination.[4] Plaintiffs' case was presented to the jury on the theory that defendants had been negligent in knowingly entrusting the aircraft to Meier for a flight to the South Lake Tahoe airport. They did not assert that Meier was incompetent to fly to low altitude airports, but only that he was incompetent to fly into and out of the South Lake Tahoe airport. We find substantial evidence in the record to support a reasonable inference that Jeffrey Marconet was aware of Meier's destination when he entrusted the aircraft to him.

Jeffrey Marconet testified that he "[a]bsolutely" did not know at the time he surrendered the keys to the aircraft to Meier that Meier's destination was South Lake Tahoe. He claimed that, notwithstanding the fact that he personally handled the rental transaction with Meier and he personally released the aircraft to Meier, he had not inquired about Meier's destination, and no one had told him of Meier's destination prior to Meier's departure. The testimony at trial established that several other Inbound employees were aware that Meier intended to fly to South Lake Tahoe prior to Meier's departure. Although Jeffrey Marconet admitted that he had learned of Meier's destination from these employees, he insisted that he had not acquired this information until after Meier's death.

We believe that the jury could have reasonably inferred from this evidence that Jeffrey Marconet was in fact aware of Meier's destination prior to releasing the aircraft to him. Jeffrey Marconet's personal involvement in the transaction, his role as Inbound's manager and his insistent testimony of lack of awareness along with his demeanor at trial could have supported an inference by reasonable jurors that he was falsely denying knowledge of Meier's destination in an attempt to avoid responsibility. Obviously, it was not necessary for plaintiffs to obtain Jeffrey Marconet's admission of knowledge where their evidence was sufficient to support a reasonable inference of knowledge.

### 2. *Control Over Aircraft*

■ Defendant Jeffrey Marconet argues that he could not be held liable for negligently entrusting the aircraft to Meier because Inbound, not he,

---

[4]In defendants' opening appellate brief, they asserted, without elaboration, that there was "no basis in the evidence" for finding Jeffrey Marconet liable for negligent entrustment. In their reply brief, they elaborated on their contention. We permitted plaintiffs to submit a supplemental brief addressing this issue to ensure that they had an adequate opportunity to respond to the contention.

"managed controlled and operated the aircraft" for rental purposes. The evidence at trial did indicate that Jeffrey Marconet had leased the aircraft to Inbound. The details of this transaction were not admitted into evidence at trial. Jeffrey Marconet admitted that he benefited from each rental transaction involving his aircraft. In the absence of evidence that Jeffrey Marconet *did not* retain some level of control over the aircraft, his personal release of the aircraft to Meier, combined with his admitted personal interest in renting the aircraft, could have supported a finding that he had the capacity to entrust the aircraft to others notwithstanding Inbound's lease.

He also claims that he could not be personally liable for entrusting the aircraft to Meier as he was acting solely as Inbound's employee when he did so. In light of his admitted personal interest in the rental of his aircraft, the jury could have reasonably inferred that he was not acting *solely* as Inbound's employee when he entrusted the aircraft to Meier. The jury could have concluded that he was acting in a dual capacity as both Inbound's employee *and* the aircraft's owner. Such an inference would support finding Jeffrey Marconet personally liable for negligent entrustment.

### B. *Instructions*

■ Defendant Jeffrey Marconet asserts that the court should not have instructed the jury on his vicarious liability for Meier's negligence because he admitted and offered to stipulate to his vicarious statutory liability for Meier's negligence. He also argues that the court's instruction to the jury that Inbound was liable for his acts as its agent was erroneous. He seems to argue that the vicarious liability instructions could have been improperly used by the jury in conjunction with the instruction on Inbound's respondeat superior liability. The problem with his argument is that these instructions were properly given and none of them contained any misinformation which threatened to mislead the jury.

The jury was given proper instructions on vicarious liability. "When an owner of an aircraft expressly or impliedly gives permission to another to use the aircraft, the owner is liable for any negligent or wrongful act or omission on the part of the person so using the aircraft. If that user expressly or impliedly gives permission to a third person to use the aircraft the owner is negligent for any wrongful act or omission of the third person. [¶] It has been established in this case that at the time of the accident in question the aircraft then being used by the defendant, Charles Meier, was owned by defendant Jeffrey Marconet and that it was being used with the permission of the owner. It follows, therefore, under the law, if defendant Charles Meier is

liable, both are liable." These instructions told the jury that it was required to hold Jeffrey Marconet liable *with Meier* if it concluded that *Meier was negligent.* These instructions were expressly limited to Jeffrey Marconet's *joint liability with Meier* for Meier's negligence. They did not purport to address Jeffrey Marconet's liability for negligent entrustment. Hence, there is no reasonable probability that the jury could somehow have used *these* instructions to find Jeffrey Marconet liable for negligent entrustment. Even if Jeffrey Marconet's willingness to stipulate to his vicarious liability should have precluded instructions on that issue, the instructions were not erroneous or misleading so the giving of them was not prejudicial error.

The jury was properly instructed on Inbound's respondeat superior liability for Jeffrey Marconet's acts as its agent. "It is established that J. D. Rosselott and Jeffrey Marconet were the agents of defendant Inbound Aviation. Therefore, any act or omission of J. D. Rosselott and Jeffrey Marconet was, in law, the act or omission of defendant Inbound Aviation." Exactly how this instruction could have been misused by the jury to support a finding that Jeffrey Marconet was liable for negligent entrustment is not explained by defendant Jeffrey Marconet in his appellate briefs. This instruction clearly told the jury that Inbound was liable for Jeffrey Marconet's acts as its agent. It said nothing about Jeffrey Marconet's liability for negligent entrustment. The court did not err in giving this instruction, nor did it prejudicially err in giving all of these instructions. As a group, these instructions did not threaten to mislead or confuse the jury and were appropriate to the causes of action alleged by plaintiffs.

## C. *Limit on Damages for Vicarious Liability*

Defendant Jeffrey Marconet also asks this court to modify the judgment to limit to $15,000 his liability for the damages attributed by the jury to Meier's negligence. He correctly points out that vicarious liability under Public Utilities Code sections 21404 and 21404.1 is limited to $15,000. The trial court stated that it intended to so limit any judgment based on the vicarious liability verdict, but it did not do so. Plaintiffs concede that any judgment based on Jeffrey Marconet's vicarious liability must be limited to $15,000, but they argue that there is no portion of the damages to which this limitation may be applied because the jury was not asked to allocate any portion of the damages to Jeffrey Marconet's vicarious liability. We conclude that the judgment should be modified.

It is true that the jury was not asked to allocate damages as to Jeffrey Marconet. Ordinarily, a defendant who chooses not to request allocation of

damages may not challenge the judgment on the ground that he should only be held liable for a portion of the damages. (Cf. *Brown* v. *Regan* (1938) 10 Cal.2d 519, 523-524 [75 P.2d 1063] [party cannot complain about ambiguous verdict where party opposed clarification]; *Fein* v. *Permanente Medical Group* (1985) 38 Cal.3d 137, 156 [211 Cal.Rptr. 368, 695 P.2d 665] [defendant cannot complain about undifferentiated special verdict where defendant failed to request differentiation].) However, in this case, the instructions given by the trial court regarding allocation of damages establish that the damages allocated by the jury against Inbound included the damages attributable to *all* defendants found liable for negligent entrustment. The court gave the following instructions as to the special verdict form's interrogatory regarding allocation of damages. "Now, Question 5 is, assuming that 100 percent represents the total negligence which caused or contributed to the decedent's death, what percentage of this 100 percent is attributable to each defendant? [¶] And the defendants are Charles Meier and the other defendant Inbound Aviation. [¶] The reason the other defendants are not listed there—remember—there are other defendants—but the reason they are not listed there is because counsel have agreed and stipulated *if any of them are negligent, then Inbound is negligent.* Simplifies your task." (Italics added.)

The court's instruction establishes that the damages allocated to Inbound included *any and all* damages that the jury attributed to Jeffrey Marconet's *negligent entrustment* of the aircraft to Meier. Hence, it is necessarily true that the damages apportioned by the jury to Meier's negligence were *not* attributable to Jeffrey Marconet's *negligent entrustment* of the aircraft to Meier. Thus, although Jeffrey Marconet is barred from challenging his liability for the whole portion of damages allocated to Inbound for the negligent entrustment liability of all defendants, the jury's verdict establishes that Jeffrey Marconet's liability for the damages allocated by the jury to Meier's negligence was attributable *solely* to his *vicarious liability* for Meier's negligence. Consequently, Jeffrey Marconet *is* entitled to limitation of his liability for this portion of the damages to the $15,000 amount authorized under Public Utilities Code sections 21404 and 21404.1 for an owner's vicarious liability for a permissive user's negligence.

### Disposition

The judgment is hereby ordered modified in the following respect. Defendant Jeffrey Marconet's liability for the damages allocated to Meier's estate shall be limited to his $15,000 statutory vicarious liability under Public Utilities Code sections 21404 and 21404.1. The trial court is ordered to

prepare and file an amended judgment reflecting this modification. This modified judgment is affirmed. Plaintiffs shall recover their appellate costs.

Cottle, P. J., and Bamattre-Manoukian, J., concurred.