[Civ. No. 17507.  Second Dist., Div. Three.  Oct. 9, 1950.]

WILLIAM WALLACE DODGE, Plaintiff and Respondent, v. HARBOR BOAT BUILDING CO. (a Corporation), Appellant; NATIONAL SHIP SERVICE COMPANY, INC. (a Corporation), Cross-defendant and Respondent.

Hansen & Sweeney for Appellant.

Sampson & Dryden and McLaughlin & Casey for Plaintiff and Respondent.

SHINN, P. J.—Defendant, Harbor Boat Building Co., a corporation, appeals from a judgment for $97,459.03 together with costs in favor of the plaintiff, William Wallace Dodge.

Plaintiff, who is the assignee of National Ship Service Co., Inc., a corporation (hereinafter referred to as National Ship), sued to recover for work, labor and services performed, and materials furnished by his assignor.

Plaintiff's amended complaint contained two causes of action: the first sought recovery of $147,782.21 as the reasonable value of work, labor and materials furnished at the request of defendant; the second was a common count based upon an account stated for the same amount; a third count, added by amendment, was predicated upon the ground that defendant had received $147,782.21 from the Navy for work and materials furnished by National Ship. Defendant Harbor Boat Building Co. (hereinafter referred to as Harbor Boat), denied the material allegations of the first, second and third causes of action, claimed by way of offset and by cross-complaint that plaintiff's assignor was indebted to it in the sum of $12,540.97, and sought damages in the sum of $38,250 by reason of the careless and negligent manner in which some of the work had been done. The trial court found that the reasonable value of the services and material furnished by National Ship was $110,000, that Harbor Boat was entitled to an offset of $12,540.97 for services which it had furnished National Ship in connection with the work done by National Ship, and that, as a result, plaintiff, as assignee of National Ship, was entitled to judgment for $97,459.03, together with costs. The sum of money sued for constituted compensation for work done and material furnished in painting, cleaning, refurbishing, repairing and renovating two vessels, the U.S.S. Jaccard [Jacquard] (also known as DE-355) and the U.S.S. Acree (also known as DE-356) which belonged to the United States government. The type of work done and materials furnished by plaintiff's assignor and the defendant is a process of preservation for inactivation, or what is known as "putting the vessels in moth balls." Harbor Boat and National Ship are both engaged in ship building and ship repair work in the Los Angeles Harbor area.

In May, 1946, representatives of National Ship met with representatives of Harbor Boat concerning the proposed preservation work to be done on Navy ships in Los Angeles Harbor. As an outgrowth of this meeting, Harbor Boat, after representatives of both concerns had inspected the work being done by the Navy in San Diego and the two vessels (the subject of this litigation) in Los Angeles Harbor on which such work was to be done, entered its bid on the work to be performed. After the inspection of the ships and prior to the entering of the bid, representatives of Harbor Boat and National Ship went over the specifications for the proposed work, National Ship agreed to do specified portions of the work involved and prepared an estimate of the cost of the work proposed to be done by it. The work to be done by National Ship consisted, in the main, of removing paint and rust, cleaning and painting equipment and the vessels themselves. The estimates prepared by National Ship with reference to the work to be done by it for Harbor Boat in the moth-balling process totaled $24,195 for each ship, and were accepted by Harbor Boat in its purchase orders of June 12, 1946. Harbor Boat's bid was accepted by the Navy and it was to do the preservation work on the Jaccard for the sum of $73,855 (this was later revised to read $74,284.64) and the work on the Acree for $74,745 (which was later revised to read $75,174.64).

In the purchase orders, signed by Harbor Boat and transmitted to National Ship, it was provided that National Ship was to "Accomplish work in accordance with the following U. S. N. Instruction Sheets. All work to be done to the satisfaction of the AIM (Assistant Industrial Manager) Resident Inspector and to be completed by the stipulated availability date: . . . " and that "It is understood that there may be changes in specifications but that no increase in price will be made unless the change is considered of a major nature and a Change Order issued by A.I.M."

The record shows that it became necessary for National Ship to perform a great deal of work in addition to that specified in its estimate to Harbor Boat and in addition to that provided for in the purchase orders signed by Harbor Boat. This additional work was necessitated by several factors: modifications and corrections in the Navy's instruction manual; express request by Harbor Boat and demands of inspectors for work not originally specified; the continuous

rusting of surfaces because the ships were not maintained by the Navy and Harbor Boat in the proper state of dehumidification during the progress of the work; lack of facilities and equipment which were to have been furnished by the Navy and Harbor Boat; the necessary, but unprovided for, dismantling of many parts in order that such parts might be cleaned and painted, and misinterpretation of instruction sheets by a subsequent Naval Inspector who required certain work to be redone after its approval by a prior inspector. The record substantiates plaintiff's argument that the preservation of ships for inactivation was something new for the Navy and a process which was, as yet, in the trial and error stage. In other words, it was, at the outset, impossible to ascertain just how much work would have to be done or the method by which it was to be accomplished. It appears that the Navy specifications and instructions were changed from time to time during the course of the work, and that on September 4, 1946, the Navy sent a communication to all companies engaged in the inactivation program in the Los Angeles Harbor which read (with the deletion of the names and addresses of the companies to which it was sent) as follows: "Subj; Change orders for Vessells Undergoing Preservation. 1. Notwithstanding any policy agreements or any phrases in article 5 of the basic job orders, *change orders will be issued for those vessels upon which changes in the work have resulted by virtue of modifications and corrections to the preservation instruction manual issued for bid purposes. Contractors are advised to prepare their estimates, as official change orders will be issued at an early date. /s/ D. L. Carroll, Jr. Asst. Industrial Mgr."* (Emphasis added.)

On September 6, 1946, the Navy issued change orders covering the work being done on the two ships here involved. The orders, which were identical, read in part as follows: "1. *This Change Order No. 332-A is hereby issued to cover all corrections and modifications to the Preservation Instruction Manual prepared for bid purposes. This includes all corrections and modifications made prior to this date.* (Emphasis added.)

"2. In submitting your estimates of any increase or decrease in cost, it is requested that you enumerate each modification, or correction, with its cost, referencing the page number of the Preservation Instruction Manual. . . . These estimates, broken down by labor, material, overhead, and profit should be submitted in the form of an enclosure to a forwarding letter."

On September 9, 1946, National Ship wrote to Harbor Boat in substantial and pertinent part as follows: "You hold prime contract from United States Navy covering certain work in progress on the above vessels. You entered into sub-contracts with National Ship Service Company, Inc. covering a portion of this work which calls for total compensation to National Ship Service Company, Inc. of $46,270.00.

"From time to time as the work progressed you instructed National Ship Service Company, Inc. to alter the work called for in the specifications and in some instances instructed us to perform certain work which was not mentioned in the specifications. As a consequence a very substantial additional cost has been incurred by National Ship Service Company, Inc. in connection with these jobs, and because of changes and additional work which we have completed and are performing at your instance very substantial further cost will be incurred by us before our work on the vessels is completed.

"We understand that you have given us the foregoing instructions and that the additional work undertaken by us upon instructions from you was occasioned through additional requirements of the United States Navy not contemplated in your original prime contract. Regardless of the reason, however, it is estimated that National Ship Service Company, Inc. has and will incur a total cost of approximately twice as great as that contemplated when we entered into the two sub-contracts with you. National Ship Service Company, Inc. of course looks to you for payment of the extras and additional work which you ordered. We believe, however, that you are entitled to consideration from the United States Navy and that you should for your own protection immediately call these matters to the attention of the proper Naval authorities.

"We have prepared an analysis, *as requested by you on September 5, 1946, which discloses the additional work accomplished* by us and now in the course of completion, which is different from the original specifications or not specified at all, and which we have been called upon to complete upon your instructions." (Emphasis added.) Following an explanatory paragraph of the breakdown of figures is an analysis of the estimated cost of the additional work performed by National Ship. The letter then reads: "We are aware of the fact that proper methods, materials and workmanship in connection with the preservation of vessels is new to everyone

and largely experimental prior to present activities in connection therewith. This handicapped both you and our company in estimating your costs and also made it difficult for the United States Navy to prescribe accurate specifications therefore both as to materials and methods.

"The great additional and unforeseen cost which we have entailed has imposed a serious if not disastrous financial burden upon our company. We believe that this is true of many if not all organizations who have engaged and are now performing the same work. Our cost to date in connection with work performed on these vessels is $66,370.00 We estimate that our total cost to completion will be approximately $83,370.00. . . .

"*Our books of account and records, payroll, insurance, taxes and material costs which will bear out the foregoing are available for inspection by you and the United States Navy at all times.*" (Emphasis added.)

On September 10, 1946, Harbor Boat replied to National Ship's letter of the 9th, as follows: "We have your letter of September 9, in reference to work as a sub-contractor on vessels DE 355 and 356. We do not agree with the intent of your letter in connection with the extra work you have performed or are performing as you had a definite contract for work to perform on these vessels, our order numbers R-600 and R-601, in which the amount was fixed and the following a provision of the work orders:

" 'It is understood that there may be changes in specifications but that no increase in price will be made unless the change is considered of a major nature and a Change Order issued by A.I.M.' (Assistant Industrial Manager's Office.)

"We are negotiating with the Navy to obtain change orders for any extra work and would like your assistance in obtaining change orders for that portion of the work you consider extra."

National Ship replied on the 12th of September, reaffirming its position that the extra work had been done under instructions from Harbor Boat and that it was entitled to be compensated therefor. On September 18, Harbor Boat wrote National Ship in part as follows: ". . . *we will use every effort possible to obtain proper additional compensation from the Navy for our extra work as well as yours. Payment for your extra work so obtained will be paid to you as soon as received.*" (Emphasis added.)

On September 24, 1946, National Ship wrote to Harbor

Boat supplementing the letter of the 9th, and itemizing the extra work and material and cost therefor for work done on the two ships. The cost of the *extra* work and material on the Jaccard amounted to $35,962.19 and for the Acree, $43,630.46.

On September 26, and 27, Harbor Boat wrote to the Navy listing the changes made and estimating the increased cost thereof. Harbor Boat's estimate of the cost for additional work done on the Acree was $89,625.36, and on the Jaccard, $83,093.34. On January 29, 1947, Harbor Boat wrote to the Navy in part as follows: "3. *The specifications on which we bid were superceded* [sic] *by changed specifications which were issued from time to time and resulted in a considerable increase in cost.* We also enclose detailed specification changes and application to the various items, enclosure (b)." (Emphasis added.) Payment was requested for additional work done on the Jaccard in the sum of $84,568.84 and on the Acree in the sum of $91,051.71. The detailed estimates which were supposed to have accompanied the two letters were apparently lost in the Navy's files and no copies thereof were produced at the trial. *It should be noted here that the figures prepared on the cost of the additional work done by National Ship were included in Harbor Boat's estimate to the Navy,* although there was no segregation of the entire work as between Harbor Boat and National Ship.

The record shows that Harbor Boat was paid in full the amount of its original bid on the two ships and that it received in addition the sum of $141,622 in full payment for the cost of additional work and materials furnished. National Ship, plaintiff's assignor, has been paid nothing by Harbor Boat.

The contentions of the defendant may be summarized as follows: Plaintiff should have sued on the contract based upon its bids which amounted to $48,390 and for the value of extra work done; there was no evidence that National Ship was authorized to perform the extra work for which it claimed compensation; there was no evidence of the value of the extra work; there was no competent evidence of the value of the total work performed by National Ship; evidence was erroneously admitted as to the value of National Ship's work and, finally, that plaintiff's evidence as to the value of its extra work should have been excluded for the reason that the bills of particulars furnished by National Ship were insufficient and were not timely filed. We are of the opinion that none of these grounds of appeal is sustainable.

■ There is implicit in the findings, conclusions, and judgment, a determination by the trial court that the value of the work done by National Ship provided a proper basis for a judgment in its favor and that it was unnecessary to sue on the original contract. This determination was one of fact and has ample support in the record. It is true that National Ship agreed with Harbor Boat to do specific work for an agreed price of $48,390 and that Harbor Boat agreed with the Navy to do the complete job for $149,459.28, but when the work had been completed National Ship had done extra work of the claimed value of $79,592.65 and Harbor Boat had done extra work (including that done by National Ship) of the claimed value of $172,718.70. As we have mentioned, Harbor Boat was paid $141,622 for work over and above its original bid. When it is understood that the entire purpose of the work was to prepare the ships for an inactive status and that the completed job accomplished no more than this, the figures we have quoted are sufficient to demonstrate that the original specifications were incomplete and wholly inadequate to call for the work that was done. Harbor Boat was finally paid almost twice the amount of its bid to the Navy, while National Ship's extra work was largely in excess of the work upon which its bid was predicated. Harbor Boat, as we shall point out, has never claimed, and cannot be heard to claim now, that the Navy did not authorize this extra work. We have examined the record, including numerous exhibits, and are satisfied that the original specifications and directions with respect to the work were altered and supplemented so extensively and in so many material particulars as to render it impossible for the trial court to segregate the work originally agreed to be done by National Ship from the total work that was required to complete the jobs to the satisfaction of the Navy. Harbor Boat's statement of the items which constituted its own and National Ship's increased and decreased costs due to changes in specifications were more than one hundred in number. Changes from the original specifications were given in great detail in the statements of Harbor Boat and National Ship and many witnesses testified with relation to the departures from the original specifications. An analysis of their testimony, found in some 2,500 pages of the reporter's transcript, would be an interminable task, and it will suffice to say that we are bound by the implied finding that there was a sufficient departure from the original specifications to render it

appropriate to use the value of National Ship's entire work as a proper basis for fixing its compensation.

As far as we can determine from the record a different result would not have been reached if plaintiff had sued upon the contract, and also for the extra work. It is clear that defendant suffered no prejudice in being confronted with the claim for the value of National Ship's total work. ▆ A fact which we think is decisive of all the contentions made by defendant is that Harbor Boat accepted National Ship's figures as to the extent and value of National Ship's extra work and incorporated them in its own demands upon the Navy. This was after Harbor Boat had been offered the opportunity to verify the claims of National Ship by an inspection of its records, and not only failed to do so, but accepted them as correct. Having received National Ship's figures Harbor Boat did not present them separately to the Navy but included them in its own claims for extra work. It undertook and agreed with National Ship to present the latter's claims to the Navy with its own and was alone responsible for the failure to segregate the claims of the two companies. It agreed to pay National Ship the amount of the latter's claims when received from the Navy. The record discloses that the responsible officers of the Navy took into consideration, in reaching an agreement with Harbor Boat, the claims of National Ship which were included in Harbor Boat's statement of the total extra work done. Also, that after the settlement was made, it was impossible to determine the amount that had been paid for National Ship's work as distinguished from that of Harbor Boat. Defendant is in no position to claim that the Navy did not make an allowance on account of the work done by National Ship in an amount sufficient to justify the judgment that was given in National Ship's favor. Moreover, if the award of the judgment be examined by deducting National Ship's bid of $48,390 from the total value of its work as found by the court it will be seen that the judgment represents only an allowance for extra work in the sum of $61,610 as against National Ship's claim for extra work of something over $79,000. Harbor Boat, under the judgment, will retain from the amount collected from the Navy $80,012, as compensation for its own extra work of the claimed value of $93,-126.05. Under the judgment, National will receive 77 per cent of the amount of its claim for extra work, while Harbor will retain 85.9 per cent of its claim for extra work. The

solution of the controversy reached by the learned trial judge is eminently fair and just and gives Harbor Boat no just cause for complaint.

For the reasons we have stated defendant's other claims of error must fail. ██ There was testimony given by Daniel Ogden, president and manager of National Ship, that the reasonable value of all work and materials furnished by National Ship was between $165,000 and $170,000. His testimony is criticized by defendant as being an unsupported conclusion but we think he was shown to be a witness well qualified and informed to testify on the subject. We find in his testimony sufficient support for the court's finding that the value of the labor and materials was $110,000. ██ But, as previously mentioned, even under defendant's theory, National Ship earned the contract price, and upon the facts we have related defendant cannot be heard to assert that the authorized extra work was worth less than the difference between the contract price and the total value of $110,000 as found by the court. From the entire evidence it is impossible to determine whether defendant received from the Navy on account of work performed by National Ship more or less than the value of National's extra work for which plaintiff has been compensated by the judgment. The manner in which the account was handled in the settlement with the Navy clearly estops defendant from questioning the value of National Ship's extra work. It would be difficult to imagine stronger circumstances for the application of the doctrine of estoppel to bar a contractor from questioning the account of his subcontractor.

██ At the outset of the trial defendant objected to the introduction of any evidence upon the ground that the bills of particulars furnished by plaintiff were insufficient, and that they were not furnished within the 10-day period after demand was made as specified in section 454, Code of Civil Procedure. Defendant demanded a bill of particulars May 19, 1948, and one was furnished July 3, 1948. A demand for a further bill was made July 9, 1948, and it was furnished July 27, 1948. On August 4, 1948, defendant filed an objection to the second bill. The trial was had January 27, 1949. Defendant's objection to the introduction of evidence was overruled and this ruling is assigned as error. We have examined the bills of particulars, which comprise 31 pages of the clerk's transcript, and are in agreement with the trial court that they were as complete as could reasonably be ex-

pected. Although they were not furnished within 10 days after the demand, it was within the discretion of the trial court to overrule defendant's objection and to receive evidence of the account. The ruling is one which should not be disturbed in the absence of a showing of clear abuse of discretion and there was, in our opinion, no abuse of discretion. (*Cromer* v. *Strieby*, 54 Cal.App.2d 405, 409, 410 [128 P.2d 916]; *McCarthy* v. *Mt. Tecarte L. & W. Co.*, 110 Cal. 687 [43 P. 391].)

Even if we had found ourselves in agreement with defendant as to claimed irregularities of pleading or procedure reversal of the judgment would not have been justified. The issues were fully tried and the judgment is not for an excessive amount. National Ship completed its contract. ▪ Defendant, while acting as National Ship's agent, collected from the Navy a single amount for the extra work of the two companies. It would say now that because it buried National Ship's claim in its own it may keep all the money collected, since it is impossible to tell how much it collected for itself and how much for its principal. The reverse is true. It became liable for money had and received (*Wagner* v. *Wedell*, 3 Cal.App. 274 [85 P. 126]) and could reasonably have been required to prove that it did not collect the entire amount of National Ship's charges.

Defendant filed a cross-complaint seeking money and damages in the amount of $50,790.97. The findings on the cross-complaint were adverse to defendant except as to a credit of $12,540.97, which was allowed. The findings on the cross-complaint are not claimed to be unsupported by the evidence.

The judgment is affirmed.

Wood (Parker), J., and Vallée, J., concurred.