98 Cal.Rptr.2d 159 (2000)
82 Cal.App.4th 373
AMELCO ELECTRIC, Plaintiff and Respondent,
v.
The CITY OF THOUSAND OAKS, Defendant and Appellant.
No. B129406.
Court of Appeal, Second District, Division Six.
July 19, 2000.
Review Granted October 25, 2000.
*162 Negele & Associates, James R. Negele, Esq., Los Angeles; Lascher & Lascher, Wendy C. Lascher, Esq., Ventura, for Defendant and Appellant.
Parker, Milliken, Clark, O'Hara & Samuelian, A Professional Corporation, Nowland C. Hong, Michael M. Mullins and Michael S. Simon, Los Angeles, for League of California Cities and Cities of Culver City, Moorpark, Murrieta, Poway, San Bernardino, Santa Rosa and Waterford as Amicus Curiae on behalf of Defendant and Appellant.
Watt, Tieder, Hoffar & Fitzgerald, Michael G. Long and Gregory J. Dukellis, Irvine, for Plaintiff and Respondent.
Bernard S. Kamine, Matt Steiner, Joseph M. Rossini, Kamine, Steiner & Ungerer, Los Angeles, for Engineering Contractors' Association as Amicus Curiae on behalf of Plaintiff and Respondent.
Thomas P. McGuire, Los Angeles, Joseph C. Malpasuto, Glendale, Monteleone & McCrory, Los Angeles, for Southern Contractors as Amicus Curiae on behalf of Plaintiff and Respondent.
Donald Bradley, Crowell & Moring, Irving, for General Contractors of California, as Amicus Curiae on behalf of Plaintiff and Respondent.
YEGAN, J.
The City of Thousand Oaks (City) appeals, after a jury verdict, awarding Amelco Electric (Amelco) $2,134,586 in damages for City's abandonment and breach of the contract to perform the electrical work required to construct the Thousand Oaks Civic Arts Plaza (the project).[1]
City contends the finding of abandonment must be reversed because a public works contract cannot be abandoned as a matter of law, there is no substantial evidence of abandonment, and the jury instructions on this issue were incorrect. City also contends the breach of contract finding must be reversed because Amelco failed to give proper notice of its claim, released its damages claims, did not prove that its damages were caused by City's breach, and did not prove that the "total cost" method of calculating damages should be applied here. City also contends that it was prejudiced by the misconduct of a juror in withholding material information during voir dire. Finally, City challenges the award of prejudgment interest and claims the cost award was excessive. We affirm, holding, inter alia, that a public works contract can be abandoned and that a contractor may recover for extra work or expenses necessitated by conditions being other than represented.

Facts
In 1992, City solicited bids for the construction of the project, which consists of a city hall, a 400-seat theater and city council chamber, an 1800-seat performing arts theater, public meeting rooms, and administrative facilities. City received five bids to perform the electrical work for the project. Amelco, one of the largest electrical contractors in the United States, was awarded the contract. Its bid of $6,158,378 was about $91,000 less than the *163 next lowest bid. All five bids were within 10 percent of each other and the three lowest bids were within 3 percent Before City awarded the contract to Amelco, City's electrical consultant confirmed that the bid contained no major omissions.
The bid package described the technical specifications and electrical drawings as complete, i.e., "100% Construction Documents[.]" The contract, however, noted that "detail sketches ... may be furnished by the Engineer from time to time during construction in explanation of said Drawings or other Contract Documents." During the two-year construction process, City furnished 1,018 sketches to clarify or change the original contract drawings. At least 248 of the sketches changed the electrical design. City and Amelco agreed upon 32 change orders, each encompassing several design changes reflected in the sketches. As a result of these change orders, City agreed to and paid Amelco $1,009,728 above the contract price, an increase of nearly 17 percent.
City generated more sketches than any of Amelco's personnel anticipated or had ever seen on other jobs. By the time construction was completed, City had changed every part of the electrical work at least once. The electrical work in one room was changed more than 40 times. Amelco's expert in electrical engineering testified that, given the number of sketches issued during construction, "the electrical design was not complete at the time of bid. Most of the sketches were not clarifications to the design but changes to the design, and providing missing information in the design." He opined that no "qualified contractor could have estimated" the number of sketches issued on this project.
Amelco found it difficult to work with the sketches. Many were drawn at a different scale from the contract drawings. Some sketches did not mark or "cloud" the changes being made, so that it was not always clear which portion of a sketch reflected the change. Other sketches were incomplete, failed to identify the contract drawing being modified, or were based on out-dated drawings that did not reflect prior changes. Because of the many changes and the difficulty in reading the sketches, Amelco found that it had to use more workers with more experience than it had estimated, increasing its labor costs. Increasing the number of workers on the job site decreased Amelco's productivity and efficiency.
During construction, City and its design professionals notified contractors of requested changes exclusively through the construction manager, Lehrer McGovern Bovis (LMB). The contractors would provide an estimate of the cost to perform the change. After LMB and the relevant design professionals approved the estimate, the contractors would perform the work. Design professionals often took several days to respond to requests for information from contractors. On many occasions, contractors were instructed by LMB to perform changed work on a "price and proceed" basis, without awaiting prior approval of the estimated costs.
Scheduling and sequencing the various contractors' work was also complicated and became more difficult as construction progressed and changes became more frequent. Like other contractors, Amelco was often required to delay or accelerate particular tasks and to shift workers among tasks to accommodate work by other trades. Amelco personnel testified they had never worked on a project as disorganized and uncoordinated as this one. These circumstances also decreased Amelco's efficiency and increased its costs to complete the project.
Throughout the construction, Amelco personnel complained to LMB about the number of changes, the sketches and the lack of organization and coordination among trades. Amelco took the position that it was LMB's responsibility to schedule the work of the various contractors and to provide contractors with updated drawings reflecting the design changes made by City. When LMB did not perform these tasks, Amelco requested a change order *164 and additional funds to hire a draftsperson for updating the drawings. LMB refused additional funds on the ground that these tasks were included in the contract price. Amelco claimed at trial that it accepted this decision only because LMB also promised that organization would improve and that changes would become less frequent. Although Amelco verbally complained to LMB about these issues, it did not provide LMB with written notice that it was losing money on the project until after it had completed its work.
Amelco gave LMB estimates of its cost to perform work reflected in the changes orders, but found it impossible to estimate the impact the changes would have on its efficiency. During construction, Amelco made no effort to track the cost impact of each individual sketch. Amelco initially attempted to keep track of the costs it incurred on each change order but it had to abandon that practice because the record keeping grew too cumbersome and time consuming.
When Amelco finished work on the project, it estimated that it had incurred a cost overrun of about $1,700,000 as a result of the design changes and poor project coordination. In January 1995, Amelco submitted a total cost claim to City, requesting reimbursement for those increased costs. Amelco's vice president, Dan Thomas, testified that John Meli, LMB's senior project manager, instructed him to submit the claim. Meli denied giving Thomas that instruction. In any event, City rejected Amelco's claim. In doing so, City did not contend that it lacked notice, during the construction phase, of Amelco's complaints or cost overruns. Instead, it concluded that Amelco lost money on the project because it did not properly coordinate its work with other trades, did not hire enough workers to install the major electrical system components efficiently, and generally mismanaged its work on the project.
Amelco filed this lawsuit for abandonment and breach of the construction contract. By the time of trial, Amelco had increased its claim to $2,224,842 because it discovered additional costs that had not been recorded when it submitted its initial claim to City. After a five week trial, the jury found in favor of Amelco on both claims, awarding it compensatory damages of $2,134,586. The trial court awarded Amelco prejudgment interest of $495,340 and costs of $134,841.33.

Abandonment of Contract
City contends that, as a matter of law, a public works contract cannot be abandoned. City also contends the abandonment finding is not supported by substantial evidence and that the jury was improperly instructed on this issue.

1. Application to public works contracts
As previously indicated (see ante, fn. 1) "[i]n the specific context of construction contracts, ... it has been held that when an owner imposes upon the contractor an excessive number of changes such that it can fairly be said that the scope of the work under the original contract has been altered, an abandonment of contract properly may be found." (Peterson, supra, 172 Cal.App.3d at p. 640, 218 Cal. Rptr. 592.) Where a construction contract has been abandoned, "the contractor who completes the project is entitled to recover the reasonable value of its services on a quantum meruit basis." (Id. at p. 645, 218 Cal.Rptr. 592.)
Relying on Miller v. McKinnon (1942) 20 Cal.2d 83, 124 P.2d 34, City contends that, as a matter of law, a public works contract cannot be abandoned because quantum meruit recovery is not available against a public agency. In Miller, our Supreme Court held that a contractor supplying labor or materials to a public agency under a contract awarded in violation of the competitive bidding statutes "has no right of action to recover in quantum meruit the reasonable value of thereof[,]" because *165 such a contract is "void and unenforceable as being in excess of the agency's power." (Id. at pp. 87-88, 124 P.2d 34.; see also Bear River Etc. Corp. v. County of Placer (1953) 118 Cal.App.2d 684, 689-690, 258 P.2d 543 [contract awarded by public officer without competitive bidding is void, cannot be ratified by public agency, and does not bind agency].)
The California Supreme Court's "statements of law remain binding on the trial and appellate courts of this state [citations] and must be applied whenever the facts of a case are not fairly distinguishable from the facts of the case in which ... [the California Supreme Court has] declared the applicable principle of law." (People v. Triggs (1973) 8 Cal.3d 884, 890-891, 106 Cal.Rptr. 408, 506 P.2d 232.) Miller is "fairly distinguishable" because it involves a public works contract awarded in violation of the competitive bidding statutes. Miller holds that a contractor may not use the equitable doctrine of quantum meruit to recover for services performed under an illegal contract. It does not preclude an award of damages based on the reasonable value of services performed pursuant to a public works contract that is abandoned. (See also Bear River Etc. Corp. v. County of Placer, supra, 118 Cal. App.2d 684, 258 P.2d 543.) Our Supreme Court has never so held and has indicated to the contrary. (See infra, p. 166.)
City further contends that Public Contracts Code section 7105, subdivision (d)(2) prohibits a public agency from abandoning a public works contract. City is incorrect. The statute provides that a public works contract required to be awarded by competitive bid, "may be terminated, amended or modified only if the termination, amendment, or modification is so provided in the contract or is authorized under provision of law other than this subdivision. The compensation payable, if any, for amendments and modifications shall be determined as provided in the contract. The compensation payable, if any, in the event the contract is so terminated shall be determined as provided in the contract or applicable statutory provision providing for the termination." (Pub. Contracts Code, § 7105, subd. (d)(2).)
This statute limits the circumstances under which a public agency may decide to terminate, amend or modify a public works contract and provides for the compensation of contractors who are affected by such a decision. It has no application where, as here, the public agency dramatically expands the scope of the work resulting in abandonment. Under these circumstances, the public agency's liability for damages caused by its breach is the same as that of a private individual. (Souza & McCue Constr. Co. v. Superior Court (1962) 57 Cal.2d 508, 510, 20 Cal. Rptr. 634, 370 P.2d 338; Tokin Construction Co. v. County of Humboldt (1987) 188 Cal.App.3d 828, 831-832, 233 Cal.Rptr. 587.) Thus, our California Supreme Court has indicated that a contractor of public works "may recover in a contract action for extra work or expenses necessitated by the conditions being other than as [originally] represented. [Citations.]" (Souza & McCue Constr. Co. v. Superior Court, supra, 57 Cal.2d at p. 510, 20 Cal.Rptr. 634, 370 P.2d 338.)
There is a presumption that statutes do not, by implication, repeal established common law rules. (California Assn. of Health Facilities v. Department of Health Services (1997) 16 Cal.4th 284, 297, 65 Cal.Rptr.2d 872, 940 P.2d 323.) Thus, as a general rule, statutes are construed to avoid conflict with the common law. (Ibid., see also Borg-Warner Protective Services Corp. v. Superior Court (1999) 75 Cal.App.4th 1203, 1207, 89 Cal. Rptr.2d 687; Frost v. Geernaert (1988) 200 Cal.App.3d 1104, 1108, 246 Cal.Rptr. 440.) Public Contracts Code section 7105 does not expressly repeal the established common law rule that the contractual liability of a public agency is the same as that of a private individual. Accordingly, we presume it was not intended to do so. We conclude that the Souza rule applies where *166 there is an abandonment of a public works contract.
The Sauza rule "is mainly based on the theory that the furnishing of misleading plans and specifications by the public body constitutes a breach of an implied warranty of their correctness." (Id, at pp. 510-511, 20 Cal.Rptr. 634, 370 P.2d 338.) There, the public body represented that certain soil was stable when it knew that the soil was not stable, i.e. the plans and specifications were misleading and incorrect. (Id. at pp. 510-511, 20 Cal. Rptr. 634, 370 P.2d 338.) Here, the original plans and specifications may have been technically correct when put out to public bid. But, in another sense, they were incorrect because they were so incomplete that every part of them was changed at least once. (See ante at p. 163.) Should a public agency be any less accountable for the intentional changing of every part of the electrical plan after the public bid is accepted? We think not. Where, as here, the extra work is necessitated by the conditions being other than as originally represented, i.e. where there is an abandonment, the public works contractor is entitled to recover for such extra work. In such situation, there has been no underbidding due to lack of diligence or misjudgment on the part of the public works contractor. To the extent that Jasper Construction, Inc. v. Foothill Junior College Dist. (1979) 91 Cal, App.3d 1, 9-10, 153 Cal.Rptr. 767, holds that a public works contractor may recover for extra work only if there has been an affirmative misrepresentation or concealment of material facts, we respectfully disagree.
Nothing in the recent case of Kajima/Ray Wilson v. Los Angeles County Metropolitan Transportation Authority (2000) 23 Cal.4th 305, 96 Cal.Rptr.2d 747, 1 P.3d 63, requires us to construe Public Contract Code section 7105, subdivision (d)(2) in a way to preclude abandonment in the context of a public works contract. Our holding does not "`defeat the effective operation of a public policy adopted to protect the public. [Citation.]'" (Id., at p. 316, 96 Cal.Rptr.2d 747, 1 P.3d 63.) In fact, our holding insures that in future cases, a public entity will not put a project out for competitive bidding until it knows what it wants built with adequate plans and specifications so that reasonably intelligent competitive bidding can take place. In this way, a public entity can protect itself from an abandonment claim.

2. Substantial Evidence
City contends that, if the abandonment theory is available against a public entity, it does not apply here because the evidence shows that the contract between City and Amelco was not abandoned. The jury's factual finding is, however, supported by substantial evidence.
A construction contract may be considered abandoned "when an owner imposes upon the contractor an excessive number of changes such that it can fairly be said that the scope of the work under the original contract has been altered...." (Peterson, supra, 172 Cal.App.3d at p. 640, 218 Cal.Rptr. 592.) In Peterson, the court of appeal agreed that the contract had been abandoned because the construction drawings were incomplete and the project was substantially redesigned by the owner after the contract was awarded. (Id, at p. 639, 218 Cal.Rptr. 592.) The redesign was "extensive" and "beyond the contemplation of the parties when the contract was first executed." (Id. at p. 642, 218 Cal.Rptr. 592.) The Peterson court also noted that, because of time pressure, "[m]any of these changes were made without following the procedures provided for in the written contract." (Ibid.)
The courts reached similar results in Dodge v. Harbor Boat Bldg. Co. (1950) 99 Cal.App.2d 782, 222 P.2d 697, and Opdyke & Butler v. Silver (1952) 111 Cal.App.2d 912, 245 P.2d 306. In Dodge, supra, a contract to renovate two naval vessels was abandoned where, "the original specifications and directions with respect to the work were altered and supplemented so *167 extensively and in so many material particulars as to render it impossible for the trial court to segregate the work originally agreed to be done by [the subcontractor] from the total work that was required to complete the jobs...." (Dodge v. Harbor Boat Bldg.Code, supra, 99 Cal.App.2d at p. 790, 222 P.2d 697.) Opdyke & Butler concluded that a contract to renovate a building was abandoned where the owner required "numerous changes ... many of which must have interrupted the orderly progress of the work, materially increased the contractor's cost and forced the doing of the work under disadvantageous circumstances." (Opdyke & Butler v. Silver, supra, HI Cal.App.2d at p. 918, 245 P.2d 306.) The court was also persuaded by evidence that the parties did not comply with a contract term requiring written change orders and that they made "no serious attempt ... to follow the contract requirement of separately charging for extras." (Ibid.)
More recently, Dougherty Co. v. Kimberly-Clark Corp. (1971) 14 Cal.App.3d 151, 92 Cal.Rptr. 120, held that, "Abandonment of a contract may be implied from the acts of the parties. (Opdyke & Butler v. Silver (1952) 111 Cal.App.2d 912, 916 [245 P.2d 306].) Abandonment of the contract can occur in instances where the scope of the work undertaken greatly exceeds that called for under the contract." (Id. at p. 156, 92 Cal.Rptr. 120.) There, issues of fact precluded summary judgment in an action alleging that a contract to renovate a paper mill had been abandoned. "[B]ecause of the tremendous number of changes, there was an issue as to whether the contract had been abandoned by the parties and they proceeded apart from the contract. There was evidence that the job was completely redesigned after the contract was entered into." (Ibid.) The court also notedthat, "the parties consistently ignored the procedures provided by the contract for the doing of extra work." (Ibid.)
City contends these cases require proof of three facts to support a finding that a contract has been abandoned: (1) the original contract drawings were changed in ways that were beyond the contemplation of the parties; (2) the parties ignored contractual change order procedures; and (3) the owner's conduct made it impossible for the contractor to keep accurate records of the costs incurred in performing the changed or extra work. Because it concludes that there is no substantial evidence of the second and third facts, City contends the abandonment finding must be reversed.
We disagree. A construction contract is abandoned where, after it is awarded, so many changes are made to the design that the project actually constructed is substantially different from the project described in the contract. The changes must be extensive and of a magnitude beyond that contemplated by the parties when they executed the contract. (Peterson, supra, 172 Cal.App.3d at p. 640, 218 Cal.Rptr. 592; Daugherty Co., supra, 14 Cal.App.3d at p. 156, 92 Cal.Rptr. 120.) In Peterson, Opdyke & Butler, and Daugherty & Co. the parties also ignored contractual change order procedures and were unable to keep accurate cost records. These facts, however, are not essential elements of an abandonment claim. Instead, they are evidence that the number of changes made to a project was excessive and beyond the original intent of the parties. These facts support a finding of abandonment; they are not essential to it.
In this case, there was substantial evidence that City abandoned the contract by changing every aspect of the electrical work. City issued 1,018 detail sketches changing, clarifying or correcting the original contract drawings. 213 of these were electrical sketches and at least 248 directly impacted Amelco's work. None of the witnesses, including two of the City's expert witnesses, had ever been involved in a project with as many sketches as this one. The parties also deviated from the contract's *168 change order procedure by performing many changes on a "price and proceed" basis, rather than following the procedure described in the contract.
The changes demanded by City affected every aspect of Amelco's work. Amelco estimated completion of the contract work would require 35,828 hours of labor. Its actual hours were 87,000, increasing Amelco's labor budget by more than 40 percent. 14,500 of those hours were included in change orders. City paid Amelco $1,009,728 for change order work, an increase of 16.38 percent over the contract price. Amelco actually incurred an additional $2,200,000 in costs to complete the project. Its vice president, project manager, foreman and expert witnesses all testified that it was impossible to keep accurate, contemporaneous records of all the costs created by the changes or of the total cost impact of individual sketches.
Thus, substantial evidence demonstrated that City demanded excessive changes to the electrical work on the project. These changes expanded the scope of work described in the contract documents to a point beyond the contemplation of the parties at the time the contract was executed. Under these circumstances, the jury could reasonably find the contract was abandoned.

3. Instructional error
The jury received three instructions concerning abandonment. First, Revised Special Instruction No. 52 informed the jury: "If you find that the City imposed upon Amelco an excessive number of changes such that it can fairly be said that the scope of the work greatly exceeded that called for under the original contract, you may find the contract abandoned. The Amelco-City contract can be found to be abandoned even though Amelco remained on the job and completed the work. Abandonment may also be implied from the acts of Amelco and the City." Revised Special Instruction No. 53 stated: "If you find that the City breached or abandoned the contract, then Amelco is entitled to recover the reasonable value of the work performed by it less the payments made by the City, and less any costs incurred by Amelco which are not fairly attributable to the City." Finally, Revised Special Instruction No. 54 provided: "You may find that the City breached its contract with Amelco and that the City also abandoned its contract with Amelco. Breach and abandonment of the same contract are not inconsistent; however, this does not entitle the plaintiff to a double recovery."
City contends the trial court erred in giving these instructions because it did not also require the jury to find that the parties ignored the contract's change order procedure, that the City's conduct made it impossible for Amelco to keep accurate cost records or that the parties mutually intended to abandon the contract. (See Ben-Zvi v. Edmar Co. (1995) 40 Cal. App.4th 468, 472, 47 Cal.Rptr.2d 12 [abandonment of a non-construction contract occurs where both contracting parties agree that the contract is terminated].) We are not persuaded.
First, City waived this argument by failing to request more detailed instructions on the abandonment claim, or more precisely, on its defense to that claim. (Mattco Forge, Inc. v. Arthur Young & Co. (1997) 52 Cal.App.4th 820, 841-842, 60 Cal.Rptr.2d 780.) "A party is entitled upon request to correct, nonargumentative instructions on every theory of the case advanced by him which is supported by substantial evidence. The trial court may not force the litigant to rely on abstract generalities, but must instruct in specific terms that relate the party's theory to the particular case." (Soide v. General Motors Corp. (1994) 8 Cal.4th 548, 572, 34 Cal.Rptr.2d 607, 882 P.2d 298.) In a civil case, "there ordinarily is no duty to instruct in the absence of a specific request by a party; the exception is a complete failure to instruct on material issues and controlling legal principles which may amount to reversible error." (Agarwal v. Johnson (1979) 25 Cal.3d 932, 951, 160 *169 Cal.Rptr. 141, 603 P.2d 58.) Thus, when a trial court gives an instruction which is correct, but which is too broad or too general for the particular failure to request an additional or a qualifying instruction will waive a party's right to later complain on appeal about the instruction which was given." (Suman v. BMW of North America, Inc. (1994) 23 Cal. App.4th 1, 9, 28 Cal.Rptr.2d 133; see also, White v. Inbound Aviation (1999) 69 Cal. App.4th 910, 925, 82 Cal.Rptr.2d 71; Scofield v. Critical Air Medicine, Inc. (1996) 45 Cal.App.4th 990, 1010-1011, 52 Cal. Rptr.2d 915.)
The instructions at issue here accurately informed the jury that it could find a construction contract abandoned where the owner makes "an excessive number of changes such that it can fairly be said that the scope of the work greatly exceeded that called for under the original contract...." City did not request a jury instruction on the mutual intent issue, or an instruction pinpointing its theory that the number of changes was not excessive because the parties did not ignore the contract's change order procedures and were able to keep accurate cost records. The trial court had no duty to explain these defense theories sua sponte.
Second, even if the trial court's instruction was erroneous, City has failed to demonstrate the error was prejudicial. "[T]here is no rule of automatic reversal or `inherent' prejudice applicable to any category of civil instructional error, whether of commission or omission." (Soule v. General Motors Corp., supra, 8 Cal.4th at p. 580, 34 Cal.Rptr.2d 607, 882 P.2d 298.) Instead, such error is considered harmless unless, after an examination of the entire record, we conclude it is reasonably probable that City would have obtained a more favorable result in the absence of the error. (Id. at p. 570, 34 Cal.Rptr.2d 607, 882 P.2d 298; Cal. Const., art. VI, § 13.)
Here, it is not reasonably probable City would have obtained a more favorable result had the jury received more detailed instructions. Throughout the trial, City presented to the jury the factual contentions that its changes to the electrical work were not excessive, that Amelco was fairly compensated for performing the changed work, and that Amelco lost money as a result of its own inefficiency. When it found that City breached the contract, the jury rejected City's version of the facts. Because it resolved these fact questions adversely to City, there is no reasonable probability the jury would have reached a different result if it had received more detailed instructions on abandonment.

Breach of Contract
City contends that Amelco waived its breach of contract claim by failing to comply with the notice provisions in the contract and that it released its claim by executing mechanics' lien releases with each progress payment. City also challenges the trial court's jury instructions on causation and the measure of damages.

1. Notice of Claim
Article 11.1(b) of the contract provides: "The Contract Price may only be changed by a Change Order. Any claim by Contractor for an increase in the Contract Price shall be based on written notice delivered by Contractor to the City ... promptly (but in no event later than 10 days) after the occurrence of the event giving rise to the claim and stating the general nature of the claim.... No claim by Contractor for an adjustment in the Contract Price will be valid if not submitted in accordance with this Article 11.1b."
The trial court gave the following jury instruction on the application of this contract term: "The subject construction contract requires [Amelco] to submit written notice to City of any claim within ten days of the occurrence giving rise to it (Article 11.1(b)). If you find that written notice was not given to City' by Amelco, then you must find for the City on the breach of contract claim, unless you find any of the *170 following conditions to have existed: [f] 1. If you find plaintiffs claim arises out of the defendant's breach of contract; or [11] 2. If you find the defendant had knowledge of conditions caused by the defendant giving rise to the claim; or [11] 3. If you find the defendant is unable to show that it suffered actual prejudice by the lack of knowledge and the claim was made before final payment; or [It] 4. If you find the defendant by its words or acts, waived the requirement to receive written notice."
The jury factually found that Amelco did not waive its claim for damages by failing to comply with the 10-day notice provision. City contends we must disregard this finding because the instruction was unfairly circular in that it permitted the jury to find no waiver if Amelco's "claim arises out of [City's] breach of contract[.]"
The trial court's instruction was correct. In D.A. Parrish & Sons v. County Sanitation Dist. (1959) 174 Cal.App.2d 406, 344 P.2d 883, a contractor agreed to install a sewer line for a county sanitation district. While the project was underway, the sanitation district breached the contract by changing the layout of the line and by failing to obtain the easements required to install it. When the contractor sought to recover for the breach, the sanitation district argued the claim was waived because the contractor did not give written notice as required under a notice term similar to the one at issue here. The court of appeal rejected that argument, reasoning instead that such notice terms have been, "interpreted by this court not to apply to claims arising from breaches of contract caused by the other party." (Id. at p. 414, 344 P.2d 883.) Parrish thus stands for the common sense proposition that a breaching party does not require, and may not insist upon written notice of its own breach. The trial court did not err in so instructing the jury.
Moreover, the jury's finding that Amelco did not waive its claim is supported by substantial evidence that, during construction, City had actual knowledge of Amelco's complaints and increasing costs. On May 25, 1993, Amelco notified City by letter that it was becoming "impossible to maintain control of the electrical scope of work" on the project because of the many changes being made to that scope of work. Amelco repeated these concerns in a June 11, 1993 meeting with City's construction manager and again in a June 21, 1993 letter which warned City that revisions were "out of control" and that the project could become "totally unmanageable." In response to work directives it received from City, Amelco submitted over 200 "change order requests" containing its estimate of the cost to complete the changed or extra work required by City. Each such document stated that Amelco reserved the right to seek additional compensation for the cumulative impact of the changes.[2] City's construction cost expert agreed that it had received notice of Amelco's complaints.
Finally, even if the first portion of the instruction was incorrect, any error was harmless. "In assessing prejudice from an erroneous instruction, we consider, insofar as relevant, `(1) the degree of conflict in the evidence on critical issues [citations]; (2) whether respondent's argument to the jury may have contributed to the instruction's misleading effect [citation]; (3) whether the jury requested a rereading of the erroneous instruction [citation] or of related evidence [citation]; (4) the closeness of the jury's verdict [citation]; and (5) the effect of other instructions in remedying the error [citations].'" (Soule v. General Motors Corp., supra, 8 Cal.4th at pp. 570-571, 34 Cal.Rptr.2d 607, 882 P.2d 298, quoting Pool v. City of Oak-land *171 (1986) 42 Cal.3d 1051, 1069-1070, 232 Cal.Rptr. 528, 728 P.2d 1163.)
Here, the verdict was unanimous, the jury did not request a rereading of the instruction at issue or of any evidence, and no other instructions related to the notice term of the contract. There was no conflict in the evidence that Amelco did not submit a written notice of claim specifically referencing paragraph 11.1(b) of the contract. Similarly, there was no conflict in the evidence that Amelco wrote at least two letters complaining about increasing costs and excessive changes and mentioned these problems to LMB on several occasions. Amelco argued to the jury that the letters and complaints gave City actual knowledge of Amelco's increased costs. It did not ask the jury to disregard the notice term solely because City breached the contract. In these circumstances, there is no reasonable probability that the jury disregarded the evidence of City's actual knowledge and instead rested its finding of no waiver solely on City's conduct in breaching the contract. Accordingly, we conclude any error in presenting this alternative to the jury was harmless. (Soule v. General Motors Corp., supra, 8 Cal.4th at p. 571, 34 Cal.Rptr.2d 607, 882 P.2d 298.)

2. Mechanics Lien Releases
Each month during its work on the project, Amelco received a progress payment from City. In connection with each progress payment, Amelco gave City an "Unconditional Waiver and Release Upon Progress Payment." This document, the language of which is mandated by Civil Code section 3262, subdivision (d), stated that Amelco had received a progress payment "for labor, services, equipment or material furnished to The City of Thousand Oaks on the job of Civic Arts Plaza ... and does hereby release pro tanto any mechanic's lien, stop notice or bond right that the undersigned has on the above referenced job ..." through the date of the release.
City contends that Amelco released its claim for damages by executing these releases. The argument is without merit. The releases at issue are expressly limited to Amelco's mechanic's lien, stop notice or payment bond rights. "The mechanics' lien laws provide an alternative method of proceeding which is cumulative and not exclusive. An action to foreclose a lien under the mechanics' lien statutes does not preclude a personal action against the purchaser of materials." (Rexroth & Rexroth Inc. v. General Casualty Co. (1966) 242 Cal.App.2d 363, 371, 51 Cal.Rptr. 505; see also Civ.Code, § 3152.) Amelco's release of one available remedy does not, without more, release its right to pursue other remedies. (Civ.Code, § 1542.)

3. Causation
City contends the trial court erred because it failed to instruct the jury on the requisite causal relationship between a breach of contract and recoverable damages. City's proposed instruction stated: "Plaintiff is only entitled to recover damages for loss or harm that was caused by a breach of contract. In law, a breach of contract is considered to have caused a loss or harm if it was a substantial factor in bringing it about. Therefore, you may not award [Amelco] damages for a particular loss or harm unless you find that a breach of contract by [City] was a substantial factor in bringing it about."
The trial court rejected City's proposed instruction and instead instructed the jury, in terms of BAJI No. 10.90, that: "The measure of damages for the breach of contract is that amount which will compensate the injured party for all the detriment or loss caused by the breach, or which in the ordinary course of things, would [be] likely to result therefrom. The injured party should receive those damages naturally arising from the breach, or those damages which might have been reasonably contemplated or foreseen by both parties, at the time they made the contract, as the probable result of the breach." In *172 addition, the trial court instructed the jury: "Damages must be reasonably certain. Certainty as to the amount [is] not required. [Amelco is] not entitled to recover damages for a particular loss or type of harm unless it proves that it is reasonably certain that it has suffered such a loss or type of harm as a result of the breach by [City].... If it is reasonably certain that it has suffered a particular loss or type of harm as a result of a breach by [City], [Amelco] is entitled to recover damages for that loss or harm as long as there is a some reasonable basis for estimating or approximating the amount of loss or harm."[3]
There was no prejudicial error. The trial court correctly stated the measure of damages for a breach of contract. (Civ.Code, § 3300.) "Causation of damages in contract cases, as in tort cases, requires that the damages be proximately caused by the defendant's breach, and that their causal occurrence be at least reasonably certain." (Vu v. California Commerce Club, Inc. (1997) 58 Cal.App.4th 229, 233, 68 Cal.Rptr.2d 31.) A proximate cause of loss or damage is something that is a substantial factor in bringing about that loss or damage. (See, e.g., BAJI No. 3.76; Mitchell v. Gonzales (1991) 54 Cal.3d 1041, 1052-1053, 1 Cal.Rptr.2d 913, 819 P.2d 872.) Although the term "substantial factor" has no precise definition, "`it seems to be something which is more than a slight, trivial, negligible, or theoretical factor in producing a particular result.'" (Espinosa v. Little Co. of Mary Hospital (1995) 31 Cal.App.4th 1304, 1314, 37 Cal. Rptr.2d 541, quoting com. to BAJI No. 3.76 (8th ed.1994 bound vol.) p. 99.)
Here, the trial court's instructions properly required the jury to find that Amelco's losses were "caused by the breach," and "in the ordinary course of things, would [be] likely to result therefrom." In addition, the jury was informed that Amelco could recover only those damages "naturally arising from the breach, or those damages which might have been reasonably contemplated or foreseen by both parties, at the time they made the contract, as the probable result of the breach." In our view, these terms are the functional equivalent of "substantial factor." If damage "naturally arise[s]" from a breach of contract, or might reasonably have been foreseen as "the probable result" of a breach, the breach was a substantial factor in bringing about the damage. Because the trial court's instructions adequately described the requisite causal relationship between City's conduct and Amelco's damage, we conclude its refusal to give City's proposed "substantial factor" instruction was, at most, harmless error. (Mathis v. Morrissey (1992) 11 Cal.App.4th 332, 343, 13 Cal.Rptr.2d 819; Fleming v. Safeco Ins. Co. (1984) 160 Cal.App.3d 31, 41, 206 Cal. Rptr. 313.)
City argued at trial, and contends here, that Amelco's damages claim is inconsistent with the "uncontroverted" evidence that Amelco made a profit on the change order work. According to City, the trial court's instructions were incomplete because they did not require the jury to confront this inconsistency. We are not persuaded. First, for the reasons stated above, the instructions did not permit the jury to ignore the question whether Amelco's losses were caused by the excessive changes. Second, the evidence that Amelco profited from the change order work was not uncontroverted. Amelco presented substantial evidence that overall, it lost money on the contract. Its employees and experts testified the losses were caused by inefficiencies which were, in turn, caused by the excessive changes. Accordingly, we conclude it is not reasonably probable the jury would have reached a result more *173 favorable to City had it received the "substantial factor" instruction in addition to those provided by the trial court.

4. Measure of Damages
In addition to the instructions quoted above, the trial court instructed the jury: "If you find that the City breached or abandoned the contract, then Amelco is entitled to recover the reasonable value of the work performed by it less the payments made by the City, and less any costs incurred by Amelco which are not fairly attributable to the City." This instruction describes the "total cost" method of calculating damages, a method that is frequently used in cases involving the abandonment or breach of a construction contract. (See, Peterson, supra, 172 Cal.App.3d 628 at p. 644, n. 11, 218 Cal.Rptr. 592.)
City contends the instruction was incorrect because it did not require the jury to make certain factual findings before using the total cost method to calculate Amelco's damages. According to City, the total cost method may be used to calculate damages for the owner's abandonment or breach of a construction contract only when the contractor proves, "(1) the impracticability of proving actual losses directly; (2) the reasonableness of its bid; (3) the reasonableness of its actual costs; and (4) lack of responsibility for the added costs." (Servidone Construction Corp. v. United States (Fed.Cir.1991) 931 F.2d 860, 861. See also In re Meyertech Corp. (3rd Cir. 1987) 831 F.2d 410, 419.) There was no prejudicial error.
City waived this claim by failing to request that the jury be so instructed. (Suman v. BMW of North America, Inc., supra, 23 Cal.App.4th at p. 9, 28 Cal. Rptr.2d 133; White v. Inbound Aviation, supra, 69 Cal.App.4th at p. 925, 82 Cal. Rptr.2d 71; Scofield v. Critical Air Medicine, Inc., supra, 45 Cal.App.4th at pp. 1010-1011, 52 Cal.Rptr.2d 915.) Had the objection been preserved, we would reject it. Where the owner breaches a construction contract by refusing to pay for extra work or materials, "the party performing will be entitled to recover what [the extra work or materials] are reasonably worth." (Frank T. Hickey, Inc. v. L.A.J.C. Council (1954) 128 Cal.App.2d 676, 687, 276 P.2d 52; see also Macomber v. State of California (1967) 250 Cal.App.2d 391, 401, 58 Cal.Rptr. 393 [contractor performing extra work on state public works project entitled to recover "the reasonable value of the extra work done."]; Healy v. Brewster (1967) 251 Cal.App.2d 541, 553, 59 Cal. Rptr. 752 [awarding contractor "reasonable value of the extra work" performed].) One appropriate measure of the value of furnishing extra work or materials is their reasonable cost. (See, e.g., Lesny Development Co. v. Kendall (1985) 164 Cal. App.3d 1010, 1021-1022, 210 Cal.Rptr. 890.) The trial court did not err in so instructing the jury.
City contends the damages are excessive because the overhead and profit rates used by the jury exceed those provided in the contract and because the jury awarded damages for superintendence and for bond and insurance premiums which, under the contract, were to be included in overhead. Because Amelco established that the contract was abandoned, however, its recovery was not limited to the amounts provided in the contract. Rather, the jury could lawfully award Amelco damages based upon the reasonable value of its services. Its findings are supported by substantial evidence.

Juror Misconduct
City contends the trial court erred in denying its motion for a new trial based on the misconduct of the jury foreman, Mr. Barazani, in concealing information during voir dire. Barazani stated on voir dire that he was a retired attorney whose 25year practice was primarily transactional and included one or two trials. Counsel for City later asked a group of prospective jurors, including Barazani, "Have you been involved in any lawsuits?" Barazani asked: "What do you mean by lawsuits?" *174 Counsel explained, "Lawsuits. Someone sues you or you sue someone, other than in a small claims action." Mr. Barazani did not respond. Barazani was selected as a juror and later elected foreman.
After the trial concluded, City learned that Barazani had been a party in at least eight civil actions. These included actions for breach of contract in which Barazani was a plaintiff. One of the matters was pending during the instant trial. In support of its motion for new trial, counsel for City declared: "Had I known that Mr. Barazani, an attorney, had been personally involved in so many pieces of litigation, one of which was a breach of contract action pending at the time of trial, I would have excused him as a juror in this case."
One of the other jurors, Ms. King, declared that, as, the jury was walking to the jury room to begin deliberations, Barazani told her that, "judges `like' unanimous verdicts, and said, with reference to our deliberations, `this is going to go quickly[.]'" Another juror said that Barazani should be elected foreman because "`he knows about the law.'" Barazani allegedly scolded King after she made comments about the facts, by telling her, "You can't say that, that's illegal. Stop saying that. That's speculation." He resisted her attempts to go through the sketches and to review the City's charts listing Amelco's costs to perform the contract.
King's declaration was disputed by another juror, Mr. McKinney, who denied hearing Barazani scold King. McKinney stated that every juror was allowed to state his or her view of the case. He described King as an outspoken juror who "stated her views and opinions in great detail and did not appear intimidated or shut down by Mr. Barazani at all." McKinney believed that King voted to award damages to Amelco.
The trial court denied City's motion for new trial because it found the evidence that Barazani committed misconduct to be "ambiguous," and found no "viable probability" that his conduct intimidated King or resulted in actual prejudice to City. City contends the trial court erred. There was no error.
A "juror's intentional concealment of relevant facts or giving false answers during the voir dire examination constitutes misconduct and raises a presumption of prejudice." (Wiley v. Southem Pacific Transportation Co. (1990) 220 Cal.App.3d 177, 189, 269 Cal.Rptr. 240.) The presumption of prejudice may be rebutted by affirmative evidence that prejudice does not exist, "`"or by a reviewing court's examination of the entire record to determine whether there is a reasonable probability of actual harm to the complaining party [resulting from the misconduct]...."' (People v. Miranda (1987) 44 Cal.3d 57, 117 [241 Cal.Rptr. 594, 744 P.2d 1127], quoting Hasson v. Ford Motor Co. (1982) 32 Cal.3d 388, 417 [185 Cal.Rptr. 654, 650 P.2d 1171]; Wiley v. Southern Pacific Transportation Co., supra, 220 Cal.App.3d at p. 189 [269 Cal.Rptr. 240].)" (In re Hitchings (1993) 6 Cal.4th 97, 119, 24 Cal.Rptr.2d 74, 860 P.2d 466.)
The trial court's denial of City's motion for new trial "`"implies a determination by the trial judge that the misconduct did not result in prejudice."' (Tillery v. Richland, (1984) 158 Cal.App.3d 957, 970 [205 Cal.Rptr. 191].)" (English v. Lin (1994) 26 Cal.App.4th 1358, 1364, 31 Cal. Rptr.2d 906.) We independently review that mixed question of fact and law. (People v. Nesler (1997) 16 Cal.4th 561, 582, 66 Cal.Rptr.2d 454, 941 P.2d 87.) In evaluating whether the presumption of prejudice was rebutted, we consider "the strength of the evidence that misconduct occurred, the nature and seriousness of the misconduct, and the probability that actual prejudice may have ensued." (Hasson v. Ford Motor Co. (1982) 32 Cal.3d 388, 417, 185 Cal. Rptr. 654, 650 P.2d 1171; see also Province v. Center for Women's Health & Family Birth (1993) 20 Cal.App.4th 1673, 1679, 25 Cal.Rptr.2d 667.)
*175 Here, substantial evidence demonstrates that Barazani committed misconduct by concealing during voir dire his personal involvement in several lawsuits. Our review of the entire record, however, supports the trial court's determination that the misconduct was not serious and did not result in actual prejudice to City. First, the fact that Barazani was himself a litigant does not permit a reasonable inference that he was actually biased against City, that he refused to deliberate or that he prejudged the issues presented. (See, e.g., Province v. Center for Women's Health & Family Birth, supra, 20 Cal. App.4th at pp. 1678-1679, 25 Cal.Rptr.2d 667 [during trial, juror stated trial was "ridiculous" and "a waste of time"]; Wiley v. Southern Pacific Transportation Co., supra, 220 Cal.App.3d at 185, fn. 2, 269 Cal.Rptr. 240 [in trial for injuries suffered by trespassing youth, juror concealed fact that he'd been sued on similar grounds and had "no sympathy for any trespasser..."]; Clemens v. Regents of University of California (1971) 20 Cal.App.3d 356, 362-363, 97 Cal.Rptr. 589 [in medical malpractice case, juror concealed his prior employment as a dentist and his bias against persons who pursue malpractice claims].)
Second, City failed to show a reasonable probability that any bias Barazani might have had resulted in actual harm to City. (In re Hitchings, supra, 6 Cal.4th at p. 119, 24 Cal.Rptr.2d 74, 860 P.2d 466.) City presented no evidence that Barazani's purported bias affected any other juror. Four dissenting votes were required for a mistrial; nine were needed for City to prevail. The verdict here was unanimous as to both liability and damages. At most, City demonstrated that one juror might have voted differently. And even that evidence is weak. Juror King stated that Barazani tried to cut off deliberations, not that she would have voted differently in his absence. Accordingly, there is no indication that Barazani's "`disqualification for bias ... could have resulted in a different verdict.'" (Province v. Center for Women's Health & Family Birth, supra, 20 Cal.App.4th at p. 1680, 25 Cal.Rptr.2d 667, quoting Weathers v. Kaiser Foundation Hospitals (1971) 5 Cal.3d 98, 110, 95 Cal. Rptr. 516, 485 P.2d 1132.) In the absence of such evidence, the trial court correctly concluded that City was not prejudiced by the misconduct and was not entitled to a new trial.

Prejudgment Interest
City contends the trial court erred in awarding Amelco prejudgment interest. The argument is without merit. Civil Code section 3287, subdivision (b) grants the trial court discretion to award prejudgment interest on an unliquidated claim. City contends subdivision (b) does not apply here because the trial court did not exercise discretion and instead simply signed a proposed judgment prepared by Amelco. To the contrary the record demonstrates that, although the trial court signed the judgment before receiving City's objections, it later stated that it would review those objections and make any necessary changes to the judgment. The trial court did not change its ruling, but later informed City that it had reconsidered the issue, stating, "I did consider [City's objections]. I went back and reviewed it. I don't think a hearing is required." The only inference that can be drawn from this record is that the trial court exercised its discretion to award Amelco the prejudgment interest it sought. City has made no effort to demonstrate an abuse of discretion and none appears.

Costs
City contends the cost award was excessive because it included expert witness fees of $10,421 for participation in a voluntary mediation and expert witness fees of $40,000 for the preparation of Amelco's total cost claim and supporting documents. The argument is without merit. The trial court had discretion to award Amelco its expert witness fees. (Code Civ. Proa, §§ 998, 1033.5, subd. (b)(1).) This *176 includes fees for participation in mediation (Gibson v. Bobroff (1996) 49 Cal.App.4th 1202, 1208-1209, 57 Cal.Rptr.2d 235), and for preparation of documents reasonably necessary for trial. (See, e.g., Applegate v. St. Francis Lutheran Church (1994) 23 Cal.App.4th 361, 365, 28 Cal.Rptr.2d 436.) There was no abuse of discretion. (Estate of Gilkison (1998) 65 Cal.App.4th 1443, 1448-1449, 77 Cal.Rptr.2d 463; Citizens for Responsible Development v. City of West Hollywood (1995) 39 Cal.App.4th 490, 506, 45 Cal.Rptr.2d 917.)

Conclusion
The judgment is affirmed. Costs to respondent.
GILBERT, P.J., and COFFEE, J., concur.
NOTES
[1] The word "abandonment" is a word of art in the context of construction contracts. In this context, it does not mean that the parties thereto sever their rights and responsibilities. "[W]hen the owner imposes upon the contractor an excessive number of changes such that it can fairly be said that the scope of the work under the original contract has been altered, an abandonment of contract properly may be found. [Citations.] In these cases, the contractor, with the full approval and expectation of the owner, may complete the project. [Citation.] Although the contract may be abandoned, the work is not." (C. Norman Peterson Co. v. Container Corp. of America (1985) 172 Cal.App.3d 628, 640, 218 Cal.Rptr. 592, hereafter Peterson.)
[2] The change order requests stated: "Please be advised that we [Amelco] are not asking for additional time for this change; however, should this change or the accumulation of changes impact the original schedule, installation sequences creating delays or accelerations which affect our work, we reserve the right to submit our cost for additional compensation."
[3] The jury was also instructed that the essential elements of a claim for breach of contract include, "Damages to [Amelco] caused by the breach[]" and that Amelco was not, "permitted to recover damages for any harm that it could have avoided by making reasonable efforts or expenditures."